*119 OPINION OF THE COURT
Gabrielli, J.
The defendant stands convicted of robbery in the first degree, two counts of assault in the first degree, three counts of attempted assault in the first degree and possession of a weapon as a felony, all following a jury trial. These charges stem from the armed robbery of O’Lunney’s Steak House in New York City, during which a patron and a police officer were shot by the robber. The Appellate Division unanimously affirmed the convictions.
In the early morning hours of December 21, 1972 Officers Woodrow Dury and Dennis Dowd were on anticrime patrol in Manhattan when they spotted a suspicious looking person who was walking back and forth in an unusual manner. Officer Dury noted that the man was not well dressed, wearing a hat that was a "little small”. The man was later described as wearing a topcoat and a hat pulled down over his forehead. The officers followed the man to O’Lunney’s Steak House. During the course of this investigation they were joined by Officers James Ward and Richard Rossi who were also on anticrime patrol. Officer Rossi parked his patrol car and waited while Officer Ward joined the other policemen, following the suspect into the restaurant. Upon entering the premises the officers positioned themselves close to the suspect in a well-lighted spot near the front bar area which, the testimony shows, provided them, with a good opportunity to observe.
After ordering a drink the suspect walked over to the center of the bar, looked at the open drawer of the cash register, and started to walk away when suddenly he pulled a gun and ordered all present to the back of the bar. Looking directly at Officer Dury, he declared "This is it. This is a stick-up * * * get in back big timer”. Most of the patrons started to withdraw to the back of the bar and the officers moved to a side alcove.
Edward Blagden, one of the customers at the bar, refused to comply with the demand to back up and as he edged slightly closer, the gunman shot him through the right thigh. Blagden fell to the floor. Eammon Doran, the bartender, startled by the shot, looked up and recognized the gunman, who was then repeating his order to "get in back”. The shot also drew the attention of Shaun Flynn, another customer, who looked at the gunman and recognized him from earlier in the evening *120 when Flynn had been sitting about five feet from him at the bar.
As people were moving back, Officer Dowd stepped out from the alcove and lunged at the robber and ordered him to drop the gun. But the gunman pulled away and shot Dowd in the stomach, saying "Take that, you —”. The gunman then ordered Dowd, wounded and suffering, to go to the cash register and empty the money drawer. Grabbing the money, approximately $280, the gunman exited the bar, warning everyone to remain still for five minutes. Officers Dury and Ward started out of the alcove to pursue the gunman who suddenly reappeared, repeated his warning, and then again left.
Officers Dury and Ward immediately pursued the gunman into the street where they saw him, still wearing a hat, running across 49th Street. Rossi, who was still waiting in the patrol car, joined his companions. The gunman crossed Second Avenue and turned east on 50th Street. As the officers reached the corner of Second Avenue and 50th Street, Dury used his walkie-talkie to call for assistance. Officers Ward and Dury then called to the fleeing gunman, "Police, drop the gun”. In response the gunman turned and fired a shot at the officers who each returned a shot. Within seconds, a patrol car operated by Officers Robinson and Moeser answered the call for assistance and Officer Ward pointed to the gunman who was continuing his flight down 50th Street. The patrol car took chase and finally stopped the gunman at the corner of First Avenue. The man resisted but the police subdued him, handcuffed him and placed him in the back of a police car.
During the chase, Officer Dury who was pursuing on foot, had seen the man drop his gun and fling the money away. Likewise, Officer Moeser from his position in the patrol car had observed the gunman throw certain items away. Moeser later returned to the spot where he had seen something tossed aside and recovered money which was unquestionably identified with the robbery.* The gun was recovered on the north side of 50th Street by Officers Ward and Dury. Finally, the gunman’s hat, which had been knocked off during his struggle with the police, was thrown into the police car with the suspect.
Basically, the acts of the robbery and the shooting are *121 undisputed. Defendant contends, however, that this is a case of mistaken identity. During trial defendant testified that he had come downtown for dinner and a show, his wife remaining at home to complete various chores in preparation for the upcoming holidays; that at 2:30 a.m. he returned to his car only to find that he had a flat tire. Additionally, he stated that after repairing the tire he started to drive home down 50th Street when he noticed an antique store at the corner of Second Avenue; that although it was after 3:00 a.m. he parked his car and walked to the store to window shop because his wife was interested in an antique lamp. He further testified that he then heard a shot and saw a man. waving a gun. Thinking this to be a mad gunman, he allegedly ran down 50th Street to avoid a dangerous situation when he spotted a police car and ran towards it to report the shooting, and that the officers grabbed and arrested him. In support of his version of the facts the defendant presented a number of respected witnesses who attested to his good character.
On this appeal defendant asserts that the People failed to prove his guilt beyond a reasonable doubt. Essentially, the issue is one of identification and the identification testimony was extensive. At trial, Police Officers Dury, Dowd and Ward identified the defendant as the man they followed into the bar, who had committed the robbery and who was later apprehended in the street. In addition three civilian witnesses identified defendant as the robber and assailant. Witness Blagden, who looked directly at his assailant when he was shot while in the bar, also identified defendant. Likewise, Flynn who had been sitting within five feet of the gunman in the bar, pointed to defendant as the man who committed the robbery. And the bartender, Eammon Doran, who had served defendant a drink, corroborated this identification testimony. Even one of the defense’s own witnesses, Feti Island, a customer in the bar on the evening in question, to the apparent surprise of everyone made an in-court identification.
Officer Moeser, who joined in the pursuit following the robbery, testified that he observed the defendant throw away the gun and money later identified with the robbery, which further linked the defendant to the robbery and the shooting.
The defense places great weight on the fact that the witnesses testified that during the robbery the gunman was wearing a hat pulled down over his forehead. A hat, identified as the one the robber wore, was produced at trial. The *122 defendant claimed that he never wore a hat and that this particular hat could not be his because it was too small. This issue was placed squarely before the jury and in fact, the defendant demonstrated the fit of the hat by putting it on during the trial.
The defense contends that the gun recovered and identified as the one used in the robbery, was found with six live bullets in it. The gun was designed to hold eight shells and the testimony indicated that the gunman fired three times. The defense asserts that these facts raise doubts about the credibility of the police testimony. There was, however, expert testimony that the gun could be overloaded to hold nine bullets. Finally the defense raises a number of other minor inconsistencies in testimony in order to discredit the prosecution’s witnesses.
As noted, there were seven witnesses who identified the defendant as the man who robbed the restaurant, and shot the two people. These witnesses consisted of three police officers, three civilians introduced by the prosecution and one civilian introduced by the defense, all of whom agreed that the defendant committed the crime. These witnesses testified in detail, subject to extensive cross-examinations and the defense proof reflected solely upon their credibility. Issues of credibility are primarily for the jury (People v Erwin 42 NY2d 1064; People v Richardson, 41 NY2d 886, 887) and there was clearly sufficient evidence in quantity and quality to send this case to the jury for a verdict (People v Joyiens, 39 NY2d 197, 203). The allegations of the defendant merely challenge the credibility of the witnesses and place in dispute only findings of fact made by the jury and unanimously affirmed by the Appellate Division. But this court is without power to review determinations of fact unless it can be said, as a matter of law, that they are unsupported, or that they are incredible (NY Const, art VI, §3; People v Oden, 36 NY2d 382, 386; People v Leonti, 18 NY2d 384, 390-391; Cohen and Karger, Powers of the New York Court of Appeals, § 198, p 742). By no stretch of the imagination can it be said that the testimony of all of these witnesses was incredible as a matter of law and thus, since the Court of Appeals, by constitutional constraint, is only a court of law, we may not disturb the findings made below. Neither, of course, does this court have the discretionary power of the Appellate Division to review the facts (CPL 470.15). We are thus confined by the limits of our jurisdiction, *123 which we may not enlarge in violation of the constitutional proscription placed upon this court. In view of the overwhelming identification testimony, we cannot say that the order of the Appellate Division was improperly made and the jury verdict improperly reached.
Before trial defendant moved to suppress identification evidence because of alleged improprieties in the pretrial identification procedures. A. pretrial hearing was held to determine whether the identification testimony of the civilian witnesses was based on an impermissibly suggestive lineup (United States v Wade, 388 US 218; People v Harrington, 31 NY2d 785, 786; People v Logan, 25 NY2d 184, 188). Defendant’s counsel requested at the lineup that an independent photographer be permitted to photograph the lineup, that a stenographer be present and that defense be given the names of all the witnesses present. These requests were denied by the prosecutor and the defense contends that this denial constitutes reversible error.
There is no evidence that the lineup procedure employed by the police was in any way prejudicial or suggestive. Defendant’s counsel was present during the lineup and had a full and complete opportunity to observe the procedure used. Photographs, which were made available to the defendant, were taken of the lineup and introduced into evidence at the hearing. Finally, at the pretrial hearing the court ordered that the names of all witnesses who participated in the lineup, including those who were unable to make an identification, be turned over to defendant’s counsel. These, too, were made available to defendant. None of defendant’s complaints speak directly to the issue whether the lineup was suggestive, and the hearing court found no such evidence. Under the circumstances the motion to suppress was properly denied (see People v Blake, 35 NY2d 331, 340; People v Logan, supra; People v Reeves, 49 AD2d 537, affd 39 NY2d 1047).
We do not reach the question of the impropriety of the supplemental charge since no objection or exception was taken and thus the issue was not preserved for our review (People v Fonseca, 36 NY2d 133, 137). We have examined the other contentions, not seriously pressed, and find them to be without merit.
Accordingly, the order of the Appellate Division should be affirmed.

 A $50 bill recovered by the police had been marked, because of its uniqueness, by the bartender earlier that evening.