Joseph GRUTTOLA, Petitioner-Appellant,

v.

Edward R. HAMMOCK, Chairman of the New York Board of Parole, Respondent-Appellee.

No. 282, Docket 80–2199.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1980.

Decided Jan. 29, 1981.

Lynn W. L. Fahey, New York City (William E. Hellerstein, New York City, of counsel), for petitioner-appellant.

Mark Dwyer, Asst. Dist. Atty., New York County, New York City (Robert M. Morgenthau, Dist. Atty. of New York County, Robert M. Pitler, Asst. Dist. Atty., New York City, of counsel), for respondent-appellee.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Petitioner Joseph Gruttola appeals from a judgment of the District Court for the Southern District of New York, Motley, J., denying his petition for a writ of habeas corpus. On September 19, 1973, after a jury trial in New York State Supreme Court for New York County, Gruttola was convicted of first degree robbery, first degree assault, first degree attempted assault, and felonious possession of a weapon.[1] The conviction was unanimously affirmed by the Appellate Division, 53 A.D.2d 821, 386 N.Y.S.2d 351 (1976), and was affirmed by a divided Court of Appeals, 43 N.Y.2d 116, 400 N.Y.S.2d 788, 371 N.E.2d 506 (1977). Gruttola then petitioned the district court for a writ of habeas corpus on the grounds

---

1. Gruttola was sentenced to concurrent terms of imprisonment carrying penalties of up to fifteen years. After serving three years of these terms, Gruttola was released on parole.

that the evidence supporting his conviction was not sufficient to convict him beyond a reasonable doubt and that the exposure of lineup witnesses to prejudicial publicity rendered their identifications inherently unreliable. The district court denied the writ in an unpublished opinion. We now affirm.

## I. BACKGROUND

According to the State's case, the events leading to Gruttola's arrest began in the early morning hours of December 21, 1972, when plainclothes New York City police officers on routine patrol spotted a man walking to and fro and peering into windows in the vicinity of East 50th Street and Second Avenue. Becoming suspicious of the man, three officers followed him into the bar at O'Lunney's Steak House on Second Avenue. A fourth officer waited in a car outside.

Shortly after the officers followed the man into the bar, he walked to the cash register, drew a gun and announced a hold-up. Most of those present rushed to the rear of the premises. One of the patrons of the bar, however, moved toward the gunman, whereupon the gunman shot him. One of the plainclothes policemen then lunged at the gunman, but the gunman stepped back and fired at the officer. The gunman ordered the wounded officer to drag himself to the cash register and empty its contents. The gunman then fled the bar.

Immediately thereafter, the two other officers, joined by the one waiting outside, ran after the fleeing gunman. The man turned the corner of East 50th Street heading toward First Avenue. There was an exchange of gunfire, the officers saw the man throw away his gun and some money, and finally a patrol car radioed by the pursuing officers stopped and, with the aid of the pursuing officers, subdued the fleeing suspect. The man apprehended was petitioner Gruttola, who had been shot in the cheek during the pursuit.

Because Gruttola had no prior convictions, was a family man, and had for some time managed his own business in Queens, he was released on low bail by New York City Criminal Court Judge Bruce Wright. The District Attorney applied to another judge who revoked bail. Judge Wright thereupon reinstated the original bail of $500. Judge Wright's action unleashed a barrage of complaints by local officials, including the Mayor of New York and the Police Commissioner, and the incident received extensive coverage in local newspapers and television news reports. Many of these reports, including a front page story in the New York Daily News, featured pictures of Gruttola along with the details of the robbery and shooting on December 21. The stories, which appeared for about a week, carried expressions of outrage by various officials at the low bail set for a "coldblooded copshooter," who, it was soon found, had previously been arrested, in 1970, for felonious assault and possession of a deadly weapon, although those charges were later dropped.

After the arrest, five witnesses of the O'Lunney's robbery attended a lineup which included Gruttola. Three of the five who had been present at O'Lunney's identified Gruttola. Gruttola's counsel attended the lineup and made a number of requests regarding lineup procedures, most of which were refused. Before trial, a "Wade hearing"[2] was held to determine Gruttola's motion to suppress the identification testimony. Gruttola's counsel argued that the identification testimony of the three witnesses who picked Gruttola out of the lineup should be suppressed because of the refusal to grant his requests regarding the procedures employed at the lineup. Specifically, counsel objected to the State's refusal to allow him to have a photographer or public stenographer present, to the State's

2. The hearing derives from *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), which held that an accused has a right to counsel at a lineup and that in-court identification testimony by a lineup witness must be suppressed if the lineup was improperly conducted unless the prosecution can demonstrate that the identification is based upon independent sources.

failure to give him the names of those who viewed the lineup, and to the State's placing Gruttola with men counsel did not believe were of similar size or build as Gruttola. The judge held that there was no impropriety in the procedures employed, and therefore the identification testimony could be introduced at trial. He also held that the names of all those who viewed the lineup should be given to the defense, and they were eventually turned over during the trial.

At the trial, the prosecution called all of the police officers involved in the incident at O'Lunney's. The three officers who originally followed Gruttola into O'Lunney's all identified him as the man who entered the bar, robbed the cash register, shot a patron and an officer, and fled. The officer who remained outside during the holdup identified Gruttola as the man who entered O'Lunney's and as the man who was pursued by himself and the other officers. The three civilian witnesses who picked out Gruttola in the lineup also identified him as the gunman. The three were Eamonn Doran, the bartender at O'Lunney's, Shaun Flynn, a customer of the bar, and Edward Blagden, the patron who was shot by the gunman. Although both Doran and Blagden testified that they had seen pictures of Gruttola in the papers following the incident, they asserted that their identifications were based upon what they had seen on the night in question. Also introduced into evidence were a hat retrieved on East 50th Street, and a coat found on Gruttola when arrested. They were both identified by various witnesses as those worn by the gunman. The gun recovered on East 50th Street was introduced and was identified by all of the police and civilian witnesses as the one used or as similar to the one used by the holdup man in O'Lunney's.

The defense asserted that this was a case of mistaken identity. They argued that the pursuing officers were in O'Lunney's drinking while on duty when they were startled by the holdup. They chased the robber, but lost sight of him as he rounded East 50th Street. They came upon Gruttola, who was in the area by chance, chased after him, and beat him severely when apprehended. To cover up their drinking on duty and their mistreatment of Gruttola, they made up the story of following him into the bar and other details of the chase. The publicity generated by the events surrounding Gruttola's release on bail forced them to stick to their story to avoid embarrassment to the police department.

In support of its theory, the defense attempted to develop inconsistencies in the testimony of the police officers. It introduced pictures showing bruises on Gruttola's body after his arrest. There was also proof that the gun, an eight-cartridge automatic, had been recovered with six live rounds of ammunition, despite prosecution testimony that three shots were fired. The defense sought to discredit the testimony of the civilian witnesses by asking questions concerning the amount of their drinking on the night in question and the dim lighting in the bar at the time of the holdup, and by drawing the jury's attention to the witnesses' exposure to the publicity surrounding events following Gruttola's arrest. The defense also called to the stand one of the eyewitnesses who had failed to identify Gruttola at the lineup, although, after some prodding by the judge, he too identified Gruttola as the O'Lunney's gunman.

Gruttola himself took the stand and gave his version of the events on the night in question. He testified that he finished work in his Queens office at about 10:00 p. m. that night. After his wife declined to join him, he drove into Manhattan to see a movie and have dinner. When he returned to his car, he found it had a flat tire. He called his wife to tell her he'd be home late, fixed the flat, and headed home. At around 3:00 a. m., at the corner of 50th Street and Second Avenue, he spotted a lamp in an antique store, and got out of his car to see it. While Gruttola was looking at the lamp, a man ran by him and down 50th Street. Gruttola then heard shots and headed to his car, but after being shot at himself, he ran toward First Avenue where he saw a police car, but was overtaken and then severely beaten. Gruttola testified

that while in police custody he was given a paraffin test to determine if he had recently fired a gun. He further testified that he never wore a hat and did not own a gun.

Gruttola's wife testified that she had received a call from him telling her of the flat tire. Perhaps the most impressive testimony on Gruttola's behalf was given by a number of character witnesses who uniformly commented upon Gruttola's even-tempered manner and his reputation for honesty. The character witnesses also noted that Gruttola, unlike the O'Lunney's holdup man, never swore and never wore a hat. The defense suggested that Gruttola, the longtime owner of a successful driving school and an insurance broker, had no reason to commit this crime.

The prosecution countered by offering evidence that the gun could be "overloaded" by placing nine bullets in the chambers. It presented testimony of an officer guarding Gruttola after his arrest that no paraffin test was performed and that Gruttola had cursed on a number of occasions while under observation. The prosecution also cross-examined Gruttola about a previous incident in which he was charged with assault and possession of a weapon, although charges were eventually dropped. The jury found Gruttola guilty on all counts submitted except attempted murder for which he was acquitted. In sentencing Gruttola, the trial judge noted the inconsistencies between the conduct of the gunman and the evidence offered regarding Gruttola's background. On appeal, the Appellate Division unanimously affirmed in a brief opinion, stating that it too had difficulty reconciling Gruttola's character evidence with the crimes charged, but that the issues were resolved by the jury "after a trial that we find free of any prejudicial error." It noted that the inconsistencies should be considered by the Parole Board.

The New York Court of Appeals, in affirming, held that in light of the overwhelming identification testimony, it could not say there was insufficient evidence to establish guilt. It also found no flaws in the lineup procedures employed and found "no merit" in the other contentions pressed on appeal. Three dissenting judges, including Chief Judge Breitel, however, found that the evidence of the character witnesses along with evidence regarding Gruttola's habits of never wearing a hat and never swearing, the need to overload the gun, the lack of a paraffin test or fingerprint evidence, and the evidence that Gruttola was severely beaten, suggesting a motive for the police to assure Gruttola's conviction, all combined to suggest that there was insufficient evidence to find Gruttola guilty beyond a reasonable doubt.

## II. DECISION BELOW

Gruttola then petitioned the district court for a writ of habeas corpus on two grounds. First, he argued that exposure of the lineup witnesses to publicity created by local officials was so suggestive as to create a substantial likelihood of misidentification, thereby violating Gruttola's Fourteenth Amendment due process rights. Second, under the Supreme Court's recent decision in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), Gruttola argued that the State's evidence against him was insufficient for a rational jury to find him guilty beyond a reasonable doubt.

The district court did not reach the merits of the prelineup publicity claim. Instead, Judge Motley held that the claim had been raised for the first time on appeal in the state courts and thus had not been made when required under New York Law. *See* N.Y.Crim.Proc.Law §§ 710.20, 710.70. Therefore, the district court held that under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the merits of the claim could only be reached in a habeas proceeding if there was "cause and prejudice" for the procedural default or if the state appellate courts had ignored the default and decided the merits of the claim.

Judge Motley found that there was no cause for Gruttola's failure to raise the prelineup publicity claim at the proper juncture. There was ample opportunity to raise the claim, either at the *Wade* hearing provided by the State or afterwards. The

State's failure to turn over the names of the lineup witnesses before or at the *Wade* hearing did not prevent Gruttola from raising the claim since the facts regarding the publicity were well-known and since the State eventually turned over all the names. Moreover, the district court found that the mere citation to the narrow margin of affirmance in the Court of Appeals was insufficient to demonstrate prejudice.[3] Finally, the court held that neither of the appellate courts had reached the merits of the claim since the trial court never decided the issue on the merits, the State had raised the procedural default issue on appeal, and neither of the appellate court decisions could be read as having addressed the claim on the merits. Moreover, the district court found that the claim, though pressed before the Appellate Division, had been dropped on appeal to the Court of Appeals, and therefore the claim could not be addressed for the further reason that Gruttola had failed to exhaust his state remedies.

As for Gruttola's claim under *Jackson v. Virginia, supra,* the district court held that the claim had been preserved for habeas review. On its merits, however, the court held that a rational jury could in fact have found Gruttola guilty beyond a reasonable doubt. There was strong identification testimony, which could not be found incredible as a matter of law. Gruttola's attempt to describe the police officers' testimony as a "cover up" was an attack on the credibility of these witnesses, a matter settled by the jury. The district court found that inconsistencies in the testimony were only "minor," and could have been excused by a rational jury as a matter of slight lapses in recall. Although the court noted that character evidence may prove sufficient to raise a reasonable doubt, in this case such evidence did not "banish the quantity and quality of the identification testimony and

corroborating physical evidence found sufficient to support a rational fact-finder's verdict of guilty." Therefore, the district court held that the evidence was sufficient for a rational fact-finder to find guilt beyond a reasonable doubt.

### III.  *JACKSON v. VIRGINIA CLAIM*

Gruttola's claim that he was denied due process because he was convicted on evidence which was insufficient to establish his guilt beyond a reasonable doubt is based upon the Supreme Court's holding in *Jackson v. Virginia, supra.* In *Jackson,* the Supreme Court departed from the approach adopted in *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) under which state convictions would only be overturned on insufficiency grounds if no "evidence at all" supported conviction or if the convictions were "totally devoid of evidentiary support." *Id.* at 199, 80 S.Ct. at 625. While *Jackson* rejected this standard as inconsistent with subsequent holdings regarding the constitutionally required quantum of proof for criminal convictions, the standard enunciated in *Jackson* remains a difficult one for petitioners to meet. As stated by the Court, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). Under that standard, we must agree with the district court that the writ cannot issue on this ground.

The evidence supporting Gruttola's conviction was substantial. Eight eyewitnesses, including one originally called by the defense, testified that they recognized Gruttola as the O'Lunney's gunman. Four of the eyewitnesses were civilians and had

---

**3.** The court's reasoning on the prejudice point was somewhat unclear. Uncertain as to the proper standard for determining prejudice, the district court noted that the only evidence of prejudice raised was that the case was a close one, with three judges of the New York Court of Appeals siding with Gruttola. The court then addressed the issue of whether the fact

that three judges might find the evidence insufficient to prove guilt beyond a reasonable doubt meant that a rational jury could not find guilt beyond a reasonable doubt. Thus the district court appeared to confuse the prejudice issue with that raised by Gruttola's *Jackson v. Virginia* claim.

no motive to seek Gruttola's conviction. Moreover, the eyewitness testimony was bolstered by corroborating physical evidence. Several eyewitnesses testified that they recognized the overcoat Gruttola was wearing when arrested as that worn by the gunman. One of the bills gathered by the police on East 50th Street was identified by the bartender as one he had marked earlier that night. The gun and hat, also found on East 50th Street, were identified by all of the witnesses either as those used or as similar to those used by the gunman.

Gruttola relies heavily upon the character evidence introduced at trial. Gruttola had lived in Queens with his wife and children for many years. For over 20 years, he owned and managed a driving school and insurance business there. Members of the community who knew him for many of those years testified as to his even-tempered and soft-spoken manner and his reputation for honesty. The man described by these witnesses admittedly seems quite unlike the man who robbed O'Lunney's by shooting two men and forcing one of them to crawl to the cash register. Indeed, it was because of Gruttola's uncommon background that he was released on low bail by Judge Wright, thus setting off unusual publicity and controversy. Similarly, at every stage, the judges involved in this case have been disturbed by the difficulty of imagining that a man of Gruttola's background and reputation could act as did the gunman in O'Lunney's bar.

There was also other evidence which cast some doubt on Gruttola's guilt. It was odd that no paraffin test or fingerprint analysis was offered. There were some inconsistencies in the eyewitnesses' testimony. The hat found did not fit well on Gruttola who was never known to wear hats at all, and his gun had to be overloaded. Yet these details could well have been regarded as insignificant or as explicable. A paraffin test may not have been performed. Inconsistencies in testimony were minor, as the district court noted. The hat may have been bought only for the robbery, and the gunman may well have wanted an extra bullet.

In sum, as the district court noted, the jury's decision was largely a matter of choosing whether to believe Gruttola's version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence and the character testimony. We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.

## IV. PREJUDICIAL PUBLICITY

Gruttola's other claim for habeas relief is based upon the exposure of civilian eyewitnesses, prior to viewing Gruttola in the lineup, to highly inflammatory and prejudicial publicity, which included photographs of Gruttola. He argues that since the publicity was created by statements made by police officials, the exposure of the civilian eyewitnesses to such publicity was tantamount to conducting an impermissibly suggestive lineup. We agree with the district court, however, that we are precluded from addressing this claim because of Gruttola's failure to raise the issue before or during his trial as required by state law.

It is undisputed that Gruttola failed to raise this objection to the identification testimony either at the *Wade* hearing, where other objections were made to the police lineup, or by motion before, during or after trial. The issue was squarely raised for the first time before the Appellate Division. New York law on the timing of objections to identification testimony is clear. Section 710.70 of New York's Criminal Procedure Law states that the "exclusive method of challenging the admissibility" of identification testimony is by a motion to suppress and that "a defendant who does not make such a motion before or in the course of a criminal action waives his right to judicial determination of any such contention."

Under *Wainwright v. Sykes, supra,* federal courts on habeas review of state convictions will not entertain federal claims on which the state courts have refused to pass due to procedural defaults. Gruttola argues, however, that *Wainwright* does not

preclude our consideration of the merits of his publicity claim because the state appellate courts could overlook the procedural default and in fact passed upon the merits of his publicity claim, albeit in an extremely summary fashion. We disagree.

■ Admittedly, the state courts did not expressly hold that a procedural default occurred. Nevertheless, the absence of express reliance upon procedural grounds is not determinative of the question of federal habeas review. *See, e. g., Taylor v. Harris,* 640 F.2d 1 (2d Cir. 1981); *Lewis v. Cardwell,* 609 F.2d 926, 928 (9th Cir. 1979); *Brown v. Reid,* 493 F.Supp. 101 (S.D.N.Y. 1980). In *Wainwright* itself there was no finding of an express state court holding as to the procedural bar. Instead, federal courts applying *Wainwright* have attempted to determine, on a case by case basis, whether state procedural bars were invoked by the state courts or whether the merits of a claim remain open for federal habeas review. *See, e. g., Ulster County v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979); *Taylor v. Harris, supra; Alburquerque v. Bara,* 628 F.2d 767 (2d Cir. 1980); *Lewis v. Cardwell, supra; Bradford v. Stone,* 594 F.2d 1294, 1296 n. 2 (9th Cir. 1979); *Broadwater v. Dunham,* 479 F.Supp. 1097 (E.D.N.Y.1979); *Brown v. Reid, supra.* The cases suggest certain factors which may be helpful in determining whether a procedural default occurred: whether the federal claim was properly presented to the state courts, whether the prosecution argued the procedural default in the state courts, and, of course, whether the state court opinions suggest reliance upon procedural grounds or a determination of the merits. *See, e. g., Ulster County v. Allen, supra,* 433 U.S. at 147–54; *Alburquerque v. Bara, supra,* 628 F.2d at 772–75.

■ The parties hotly dispute the extent to which the New York appellate courts possess discretion to excuse procedural defaults. A review of the procedural history of this case, however, convinces us that, whether or not they possessed the discretion to excuse the default, the state appellate courts did not exercise that discretion, but instead declined to entertain the merits of the publicity claim because of the procedural default. Gruttola never raised in the trial court the issue of the effect of publicity on identification witnesses. When the issue, along with several other objections to the trial proceedings, was put forward to the Appellate Division, the State immediately countered that the publicity claim had not been timely made, although the other objections to lineup procedures were properly presented, and the State rebutted these and all other properly raised objections on the merits. The Appellate Division summarily affirmed, stating only that it found the trial free of prejudicial error.

Before the Court of Appeals, Gruttola submerged the publicity claim as part of an attack on the adequacy of the *Wade* hearing.[4] Once again, the State pointed out that the publicity claim had not been reached below, and added that there had been no objection to the adequacy of the hearing. The Court of Appeals treated the objections to the hearing as raising only the same issues regarding the actual lineup procedures which Gruttola had properly raised in the trial court. While the Court of Appeals concluded its opinion by stating that it examined other contentions "not seriously pressed" and found them meritless, we do not believe that the Court of Appeals, on the record before it, was referring to the publicity claim. That claim was quite strongly raised as part of the attack on the adequacy of the *Wade* hearing. The Court was most likely referring to the other, less

4. Gruttola argued that the prosecution's failure to turn over the names of lineup witnesses before or at the *Wade* hearing rendered the hearing inadequate because it prevented Gruttola from pursuing the possibility of an improper lineup. One of the possible improprieties which Gruttola was allegedly prevented from exploring was the prejudicial effect of preline-

up publicity. Because the publicity argument was thus somewhat indirectly approached, the district court held that Gruttola had abandoned this claim before the Court of Appeals and therefore the claim was not reviewable in federal court for failure to exhaust state remedies. In light of our disposition, we find it unnecessary to rely upon this ground.

forcefully argued issues, such as whether the cross-examination of Gruttola concerning the facts surrounding his previous arrest was proper.

Our conclusion is therefore that the appellate courts did not reach the merits of the claim, but instead agreed with the State that the question of the effect of prejudicial publicity on identification witnesses had never been properly presented. Gruttola argues, however, that even if this is so, *Wainwright* does not preclude consideration of the merits of his claim because there was "cause and prejudice" for his procedural default.

■ The district court found neither cause nor prejudice. Given the importance of the civilian eyewitness testimony, both in identifying Gruttola and in rebutting the defense's theory of a police conspiracy, we do not agree with the district court on the issue of prejudice.[5] Nevertheless, we do agree with the district court that there was no cause for the failure to raise the publicity issue when required by state law. The publicity surrounding Gruttola's arrest was well known to Gruttola and his counsel. It was not necessary to have the names of the witnesses to realize the possible prejudicial effect of the publicity, and, in any event, those who did identify Gruttola in the lineup were present at the trial. In fact, Gruttola's counsel cross-examined these witnesses on their exposure to the publicity, thus demonstrating he was fully aware of the publicity problem. There was ample time, then, either at the *Wade* hearing when other lineup objections were made or during the trial, to object to the introduction of the identification testimony on this ground.

■ Gruttola, however, seizing upon language in the briefs filed by the State in the state appellate courts, argues that the claim was not cognizable at the *Wade* hearing. He also argues that the state court judge would not have entertained a motion based upon publicity problems, and therefore,

there was no forum in which he could have raised the claim. We find these contentions highly implausible and without any support in state law. There was no evidence that the state court was inhospitable to claims based upon prejudicial publicity. It is quite likely, despite the State's unsupported assertions to the contrary in its appellate brief, that the court could have heard such an objection at the *Wade* hearing. In any event, New York law makes clear that some opportunity to litigate will be provided to any defendant who can make out legal grounds for suppression of identification testimony. N.Y.Crim.Proc. Law §§ 710.-20(5), 710.60 (McKinney's Supp.1980). Nothing in these statutes suggests that such a motion could not be made on the ground of prejudicial publicity. The New York courts are quite generous in granting hearings on suppression of identification testimony. *See, e. g., People v. Johnson*, 88 Misc.2d 749, 389 N.Y.S.2d 766 (1976). Indeed, they have often granted hearings even where, unlike the situation here, such hearings do not fall within the traditional statutory categories. *See* Denzer, Practice Commentary to CPL Article 710, at 263–64 (McKinney's 1971); *People v. McCall*, 17 N.Y.2d 152, 269 N.Y.S.2d 396, 216 N.E.2d 570 (1966). We thus find no support for Gruttola's claim that a motion to suppress the identification evidence because it was tainted by prejudicial publicity could not have been entertained by the trial court. We therefore do not reach the merits of Gruttola's claim regarding the effects of prejudicial publicity.

Because the evidence was sufficient to convince a rational jury of Gruttola's guilt beyond a reasonable doubt, we affirm the denial of the writ.

---

**5.** The district court had difficulty deciding the proper standard for prejudice. *See* note 3 *supra*. Under any standard, however, the civilian identification testimony was critical in this case, and if Gruttola had been able to suppress it, the jury's verdict may well have been different.