20-4140-pr
*Wilson v. Superintendent Capra*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of November, two thousand twenty-three.

PRESENT:
> BARRINGTON D. PARKER,
> JOSEPH F. BIANCO,
> > *Circuit Judges*,
> JED S. RAKOFF,
> > *District Judge.*[*]

---

JERMAINE WILSON,

> *Petitioner-Appellant*,                              20-4140-pr

> v.

MICHAEL CAPRA, Superintendent,

> *Respondent-Appellee*.

---

FOR PETITIONER-APPELLANT:              Brian A. Jacobs, Morvillo Abramowitz
                                       Grand Iason & Anello P.C., New York, NY

---

[*] Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

FOR RESPONDENT-APPELLEE:        Jason Eldrige (Leonard Joblove, Ann Bordley & Diane R. Eisner, *on the briefs*), Assistant District Attorneys, *on behalf of Eric Gonzalez*, Kings County District Attorney, Brooklyn, NY.

Appeal from an order of the United States District Court for the Eastern District of New York (Brodie, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Petitioner-Appellant Jermaine Wilson appeals from the district court's judgment, entered on October 15, 2020, denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court granted a certificate of appealability with respect to four of Wilson's claims: (1) the prosecution did not present sufficient evidence for a rational jury to convict him; (2) the trial court's admission of out-of-court statements violated the Confrontation and Due Process Clauses; (3) he was prejudiced by the trial court's failure to give a missing witness instruction; and (4) he was prejudiced by the trial court's erroneous instruction regarding witness credibility. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, which we reference only as necessary to explain our decision to affirm.

On March 30, 2010, a jury convicted Wilson of murder in the second degree, in violation of New York Penal Law § 125.25, in the New York Supreme Court, Kings County (the "trial court"). That conviction arose from the shooting of Benson Bethel outside a residential building in Brooklyn on August 8, 2006. Two eyewitnesses testified at trial: (1) Latraya Bethel ("Latraya"), the victim's cousin and a resident of a nearby apartment building; and (2) Carolyn Gavin ("Gavin"), another resident of a nearby apartment building. A New York City Police Department Detective, John Ulmer, also testified to out-of-court statements made by two

2

additional eyewitnesses, after the trial court determined that Wilson caused the witnesses' unavailability to testify. Following the jury's guilty verdict, Wilson was sentenced to a term of imprisonment of twenty-five years to life.

On March 19, 2014, the New York Supreme Court, Appellate Division (the "Appellate Division") affirmed Wilson's conviction and sentence. *See People v. Wilson*, 981 N.Y.S.2d 812 (2d Dep't 2014). On September 2, 2014, the New York Court of Appeals denied leave to appeal. *See People v. Wilson*, 24 N.Y.3d 966 (2014). The district court denied Wilson's habeas petition but granted a certificate of appealability as to four claims. *See Wilson v. Capra*, 15-CV-6495, 2020 WL 10506052 (E.D.N.Y. Oct. 12, 2020).

We review *de novo* the district court's denial of a petition for a writ of habeas corpus. *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). When a state court adjudicates a habeas petitioner's claim on the merits, a district court may grant relief only if the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented . . . ." 28 U.S.C. § 2254(d)(1)–(2). Section 2254(d) sets forth "a difficult to meet[] and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (alterations adopted) (internal quotation marks and citations omitted). "A state court acts 'contrary to' clearly established federal law if it (1) 'arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,' or (2) 'decides a case differently than the Supreme

3

Court has on a set of materially indistinguishable facts.'" *Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019) (alterations adopted) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). "An unreasonable application of federal law occurs if the state court's application of clearly established federal law was objectively unreasonable, or if it fails to extend a principle of clearly established law to situations which that principle should have, in reason, governed." *Id.* (internal quotation marks and citations omitted).

Under the "unreasonable determination of the facts" clause of § 2254(d)(2), a federal court will "presume the correctness of state courts' factual findings unless [petitioners] rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) (quoting 28 U.S.C. § 2254(e)(1)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (alterations adopted) (internal quotation marks and citations omitted).

We address each of Wilson's claims on appeal in turn.

## I. Sufficiency of the Evidence

Wilson argues that, because the testimony of Latraya and Gavin was "incredible on its face," no rational jury could have found that the evidence established that he was guilty of second-degree murder beyond a reasonable doubt. Appellant's Couns. Br. at 35. Thus, he contends that the Appellate Division's conclusion that his conviction did not violate Due Process on sufficiency grounds was an unreasonable application of Supreme Court precedent. We disagree.

"[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

4

*Jackson v. Virginia*, 443 U.S. 307, 324 (1979). When assessing the sufficiency of the evidence under this standard, a federal court "must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor," and, in doing so, "must look to state law to determine the elements of the crime." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (internal quotation marks and citations omitted). "What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (internal quotation marks and citation omitted). Therefore, sufficiency challenges "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference": on direct appeal, deference is given to the jury's determination, and on habeas review, deference is given to the state court's decision. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

In support of his sufficiency claim, Wilson points to credibility issues surrounding the two eyewitnesses who testified at trial, including, *inter alia*, that their trial testimony was inconsistent with their prior statements and other evidence in the case, and that one eyewitness (Latraya) had received financial benefits and lodging from prosecutors for several months and was hoping they would help her with her parole application. However, none of these purported credibility issues identified by Wilson rendered the testimony of either eyewitness unworthy of reliance by a rational jury. The defense presented these issues to the jury, and there is no basis to disturb the jury's credibility assessment. *See Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) ("[T]he jury's decision was largely a matter of choosing whether to believe [petitioner's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses, despite

5

the inconsistencies in the evidence and the character testimony. We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.").

Accordingly, the Appellate Division did not unreasonably apply clearly established federal law in rejecting Wilson's challenge to the sufficiency of the evidence.

## II. Admission of Out-of-Court Eyewitness Statements

Wilson next contends that the trial court's erroneous admission of out-of-court statements by two additional eyewitnesses—namely, David Sanders and Malik Evans, who both lived in the same housing complex as Wilson and the victim—violated his rights under the Confrontation Clause and Due Process Clause. Detective Ulmer was permitted to testify about the statements that Sanders and Evans made to him at trial only after the trial court held a *Geraci/Sirios* hearing,[1] outside the presence of the jury, to determine whether the unavailability of the witnesses had been caused by Wilson through threats and intimidation.

According to Detective Ulmer, on August 20, 2008, Sanders requested to speak with the detectives on the instant homicide investigation. Sanders proceeded to give an eyewitness account of the shooting, implicating Wilson. At a second interview, on March 4, 2010, while Sanders was incarcerated in connection with an unrelated crime, he partially recanted after he was told he would have to testify at Wilson's trial; specifically, he now claimed that while he had seen a verbal argument and fist fight, he was not present for the shooting, and only learned of the shooting later. Detective Ulmer testified at the *Geraci/Sirios* hearing that on March 18, 2010, the day after Wilson's trial commenced, Sanders told Detective Ulmer that he was unwilling to testify at all.

---

[1] *See People v. Geraci*, 85 N.Y.2d 359, 367 (1995) ("A determination that the defendant has procured a witness's unavailability results in the admission of hearsay statements and the forfeiture of the right to cross-examine about the substance of those statements."); *Holtzman v. Hellenbrand (Sirois)*, 460 N.Y.S.2d 591, 597 (1983) (2d Dep't 1983) (per curiam) (allowing the use of a witness's grand jury testimony if prosecutors demonstrate "that a criminal defendant's misconduct has induced [that] witness' unlawful refusal to testify at trial or has caused the witness' disappearance or demise").

Sanders told Detective Ulmer that two men had approached his father and told him that his son was "a snitch." App'x at 794. Additionally, Sanders explained to Detective Ulmer that, on that same date, he had interacted with Wilson in the courthouse holding cells. Wilson asked Sanders how his father and sister were doing, and told him that he had seen "papers" with Sanders' name on them, that he "didn't think [Sanders] would do something like that," and that Sanders should "[d]o the right thing." App'x at 796. Based upon these incidents, Sanders told Detective Ulmer that he was unwilling to testify at Wilson's trial.

With respect to Evans, Detective Ulmer testified that he first spoke to him on July 28, 2008, when Evans visited the precinct to inquire about the status of an unrelated investigation into his brother-in-law's murder. When Detective Ulmer asked him about the separate murder of Benson Bethel, Evans said that he saw Wilson and the victim in a fist fight the night of the shooting, that he observed Wilson shoot the victim in the head, and that he watched the victim fall to the ground. At the *Geraci/Sirios* hearing, Detective Ulmer testified that, on March 23, 2010, he again met with Evans, who denied telling Detective Ulmer that he witnessed the victim's murder. Evans also told Detective Ulmer that he had been approached the prior week by Wilson's cousin, Shannon, and that Shannon told Evans that his name was on a report in Wilson's case. Shannon asked Evans, "What's the deal with that," and Evans told Shannon he had only spoken to police about his brother-in-law's murder and never discussed Wilson's case. App'x at 799. Evans also told Detective Ulmer that he "didn't want to wind up dead." App'x at 816.

After the hearing, the trial court determined that Wilson and those associated with him had acted to prevent Sanders and Evans from testifying, and thus permitted Detective Ulmer to testify about Sanders' and Evans' statements implicating Wilson. Wilson contends that this decision violated his rights under both the Confrontation Clause and the Due Process Clause. In particular,

Wilson maintains that, "[i]n affirming the conviction, the Appellate Division misapplied United States Supreme Court precedent under which [he] must be shown to have acted with the purpose of causing these witnesses' unavailability, and unreasonably determined that [he] had in fact played a role in their unavailability." Appellant's Couns. Br. at 39. We disagree.

"The Sixth Amendment . . . prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). The Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Crawford*, 541 U.S. at 54. In *Giles v. California*, 554 U.S. 353, 359 (2008), after analyzing the common law, the Supreme Court determined that the forfeiture by wrongdoing doctrine permitted the introduction of hearsay statements of a witness who was made unavailable by means or procurement of the defendant. However, as the *Giles* Court explained, the forfeiture "applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.*; *see also Cotto v. Herbert*, 331 F.3d 217, 234 (2d Cir. 2003) ("[W]itness intimidation is the paradigmatic example of the type of 'misconduct' that can lead to the forfeiture of confrontation rights.").

As a threshold matter, we disagree with Wilson's contention that the state court decisions only assessed whether Wilson caused Sanders' and Evans' unavailability, not whether he intended to do so as required under the applicable Supreme Court precedent. In its thorough written opinion, the trial court determined that Wilson "had a clear motive to dissuade [Sanders and Evans] from testifying at his trial and was the only person who stood to gain from their refusal to testify," and that, "[c]onsidered together, the facts in this case established a clear connection between [Wilson]

8

and the threats which caused both Sanders' and Evans' unavailability, including the timing of the threats [near Wilson's trial] and [Wilson's] motive and opportunity to act with his cousin Shannon or to acquiesce in his cousin's and others' actions in conveying the threats."  App'x at 1130–31.  Although the trial court did not use the phrase "designed to prevent the witness from testifying" in its written decision,  *Giles*, 554 U.S. at 359 (emphasis omitted), we have no trouble concluding that the trial court's analysis reflects a finding that Wilson's conduct not only caused the witnesses to be unavailable for trial, but also was designed to do so (in concert with, or with knowledge of, the actions of his cousin and others).  *See Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (Habeas courts do not "grad[e] [a state court's] papers" in determining the reasonableness of a state court's determination of a claim.); *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) ("[F]ederal habeas courts should be wary of imposing on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim.") (alterations adopted) (internal quotation marks and citation omitted).  Indeed, the trial court's oral ruling immediately following the hearing during the trial amplified that Wilson had acted *with intent* to prevent the witnesses from testifying.  *See* App'x at 831–32 ("I think it's clear and convincing that the defendant, and those associated with him, made it clear that these witnesses do the right thing and not testify.  Because if they did, certainly harm might well come to their family. . . . Taken together, circumstantially, that the evidence here seems to logically point to the defendant and his agents intimidating or seeking to intimidate.").

The Appellate Division similarly held that "[t]he evidence presented at the *Sirois* hearing, and the inferences that logically flow therefrom, were sufficient to support the [trial court's] determination, under the clear and convincing evidence standard, that the defendant's *misconduct* caused the witnesses' unavailability to testify at trial."  *Wilson*, 981 N.Y.S.2d at 813 (emphasis

9

added) (citations omitted). That holding encompasses the Appellate Division's view that the record supported both a finding that Wilson caused the witnesses' unavailability and that his actions were the result of "misconduct"—that is, intentional actions—rather than inadvertent mistake. Thus, we reject Wilson's contention that the state courts misapplied clearly established federal law in allowing the use of the out-of-court statements of Sanders and Evans.

We also find unpersuasive Wilson's assertion that the circumstantial evidence upon which the trial court relied was insufficient to demonstrate that Wilson acted with the purpose of making Sanders and Evans unavailable.[2] More than sufficient circumstantial evidence was adduced at the *Geraci/Sirios* hearing to corroborate the statements recounted by Detective Ulmer, to link Wilson to the threats Sanders and Evans received, and to reasonably infer his intent to prevent them from testifying. For example, a Corrections Officer testified at the hearing that video surveillance from the courthouse holding facilities showed Wilson speaking to someone as he walked past a holding cell on his way to court; records indicate that Sanders was one of the individuals in that cell. Prosecutors also introduced an audio recording of a call Wilson made from Rikers Island to a friend, who then put Shannon on the phone with Wilson. The trial court explained that the recording captured Shannon telling Wilson, "You don't have to worry about anyone coming down on Monday. Because they [sic] not coming, running they [sic] mouth on you." App'x at 1128. In

---

[2]  Under New York state law, prosecutors must make this showing by clear and convincing evidence. *Geraci*, 85 N.Y.2d at 367. In contrast, although the Supreme Court has not addressed the standard of proof, this Court has applied the less demanding preponderance of the evidence standard in this context. *See United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982); *see also Cotto*, 331 F.3d at 235 ("[O]ur own circuit's requirement on the standard of proof applicable at a federal *Mastrangelo* hearing—that the government prove by a preponderance of the evidence that the defendant procured the witness's unavailability—is actually less stringent than the New York standard, which requires a showing of intimidation by clear and convincing evidence."). For purposes of habeas review, we analyze the claim under the federal standard. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). In any event, we conclude that there is no basis to overturn the trial court's factual finding even under the higher evidentiary standard.

short, we conclude that the trial court decision was not an unreasonable determination of the facts in light of the entire evidentiary record presented at the *Geraci/Sirios* hearing.

Although Wilson relies heavily on our decision in *Perkins v. Herbert*, 596 F.3d 161 (2d Cir. 2010), such reliance is entirely misplaced. In *Perkins*, we found the right to confrontation was violated when, *inter alia*, the prosecution did not demonstrate that "[petitioner] took any steps to orchestrate the intimidation of [the witness]" or "even demonstrate that [petitioner] had the opportunity to do so." *Id*. at 173. Moreover, we emphasized that the man who conveyed threats to the unavailable witness was also involved in the underlying crime and had "a strong, independent incentive to prevent [the witness] from testifying in court and potentially implicating him." *Id*. Here, in contrast, there was evidence of Wilson taking direct steps to intimidate Sanders in the courthouse holding cell, and there was no evidence in the record to indicate that Shannon (or anyone else) was involved in the victim's murder, or otherwise had any independent motive to prevent the witnesses from testifying. Thus, *Perkins* is inapposite to the factual record in this case.

Finally, Wilson argues that Sanders' and Evans' statements were so unreliable that their introduction violated due process. In other words, he contends that the Appellate Division unreasonably applied federal law in determining that Sanders' and Evans' statements could be admitted consistent with due process.[3] Wilson cites a single case for the proposition that, in certain circumstances, "considerations of due process, wholly apart from the Confrontation Clause, might prevent convictions where a reliable evidentiary basis is totally lacking . . . ." *California v. Green*, 399 U.S. 149, 163 n.15 (1970). However, that *dicta* from the Supreme Court cannot be used to

---

[3] Before the *Crawford* decision, an out-of-court statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). However, *Crawford* eliminated this additional reliability requirement for testimonial statements insofar as it was tethered to the Confrontation Clause. *Whorton v. Bockting*, 549 U.S. 406, 419–20 (2007). Thus, Wilson seeks to challenge the reliability of Sanders' and Evans' statements under the banner of due process.

support habeas relief. *See Yarborough v. Alvarado,* 541 U.S. 652, 660–61 (2004) ("For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted). In short, the Supreme Court has not clearly established that if the admission of the out-of-court statements does not violate the Confrontation Clause, the Due Process Clause mandates an independent reliability determination before such statements can be admitted. Thus, this independent due process claim is not cognizable on habeas review.

In any event, the Appellate Division alternatively concluded that "the statements were not so devoid of reliability as to offend due process." *Wilson*, 981 N.Y.S.2d at 813 (internal quotation marks and citation omitted). That was not an unreasonable determination based on the entire record, including the fact that the out-of-court statements were corroborated by the in-court testimony of two other eyewitnesses, as well as other trial evidence.

Accordingly, the admission of the out-of-court statements does not provide a basis for habeas relief in this case.

### III.    Jury Instructions

Wilson also argues that he is entitled to habeas relief based upon two errors in the jury instructions identified by the Appellate Division. In particular, the Appellate Division determined that the trial court erred in (1) declining to give a missing witness instruction, and (2) giving an instruction regarding interested witness testimony that implicitly limited consideration of the benefits that Latraya received from the prosecution. *Wilson*, 981 N.Y.S.2d at 813. However, the Appellate Division further held that the errors were harmless under New York law because "there was overwhelming evidence of the defendant's guilt, and no significant probability that the error

12

contributed to the defendant's conviction." *Id*. As set forth below, we conclude that the two errors in the jury instructions under state law do not warrant habeas relief.[4]

We emphasize that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Therefore, for a petitioner to prevail on a challenge to a jury instruction on habeas review, "'it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'" *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). Under that standard, "[t]he question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id*. (quoting *Cupp*, 414 U.S. at 147). In other words, an error of state evidentiary law may be assessed on habeas review only to determine whether it deprived the petitioner of his due process right to a "fundamentally fair trial." *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (per curiam) (quoting *Rosario v. Kulhman*, 839 F.2d. 918, 925 (2d Cir. 1988)).

First, Wilson did not demonstrate that the failure to give the missing witness instruction rose to a constitutional violation warranting habeas relief. Wilson contends that "the Appellate Division should have assessed the impact of that error together with the [t]rial [c]ourt's erroneous

---

[4] Appellee concedes that, to the extent we analyze these erroneous instructions under the federal standard (and the related claim regarding the trial testimony of the investigator regarding efforts to locate the witnesses), we should do so under *de novo* review because the Appellate Division did not analyze the claims under the federal standard. Appellee's Br. at 23, 56–57. Furthermore, although appellee argues that Wilson raised the denial of the missing witness instruction only as to one witness in the Appellate Division and has procedurally defaulted as to any claim regarding to the other two missing witnesses, we need not address this issue because we conclude that habeas relief is unwarranted even when the absence of the instruction is considered as to all three potential witnesses.

admission of Investigator Conlan's testimony about his efforts to locate three additional witnesses." Appellant's Couns. Br. at 57. However, even when the error is considered in conjunction with Investigator Conlan's testimony, there is no basis to conclude that the absence of a missing witness instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147. There were limited references to those missing witnesses during the trial, which, as the Appellate Division noted, focused heavily on the "two other eyewitnesses [who] testified and identified [Wilson] as the shooter." *Wilson*, 981 N.Y.S.2d at 813. In its opening statement, the prosecution briefly told jurors that it hoped to bring additional witnesses (other than Sanders and Evans) to testify about what they saw the night of the shooting. During the trial, the court permitted the prosecution to call Investigator Conlan to testify about efforts to procure the testimony of three additional witnesses in order to show that the witnesses had declined to cooperate and were not in the prosecution's control. Although the trial court denied defense counsel's request for a missing witness charge, it noted that defense counsel could comment on the fact that these witnesses did not testify in summation. And yet, neither the prosecution nor the defense mentioned these potential witnesses or Investigator Conlan's testimony in its summation. Additionally, in its instructions to the jury, the trial court emphasized that the jury should decide the case based solely on the evidence and "must not under any circumstances indulge in speculation or guesswork. Nor . . . consider anything outside of the evidence." App'x at 1047. Thus, on this record, we disagree with Wilson's contention that the absence of the charge "allowed the prosecution to paint an extremely damaging picture that the testimony against [him] would have been corroborated by three additional witnesses." Appellant's Couns. Br. at 58. In short, neither the lack of the missing witness instruction nor the testimony regarding efforts to locate

14

those witnesses deprived Wilson of his due process right to a "fundamentally fair trial." *Zarvela*, 364 F.3d at 418.

We reach the same conclusion regarding the trial court's interested witness instruction. That instruction, as explained by the Appellate Division, "deviat[ed] from [the] standard charge by including a further instruction which implicitly limited which benefits the jury could consider in scrutinizing the interested witness's testimony." *Wilson*, 981 N.Y.S.2d at 813. In particular, with respect to Latraya, the instruction referenced the expectation that "the District Attorney [would] help her in her parole application" with respect to her assault case. App'x at 1063–64. The instruction did not reference additional benefits that Wilson argues impacted Latraya's credibility: (1) several weeks before the trial, she had entered into a favorable plea agreement with the District Attorney's Office with respect to an assault case; and (2) the District Attorney's Office had moved her and her daughter to a hotel and given her $125 per week for food and $50 per week for Subway fares for a total of thirteen weeks.[5] As the district court noted, although these additional benefits were not mentioned in this particular instruction, there were other instructions that made clear that the jury should fully weigh the credibility of witnesses, including by considering factors such as criminal records and prior inconsistent statements. *Wilson*, 2020 WL 10506052 at *22; *see also Cupp*, 414 U.S. at 146–47 ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."). In sum, in light of numerous factors bearing on Latraya's credibility that were placed before the jury and the instructions as a whole, we cannot conclude that the incomplete list of benefits to Latraya referenced in the interested witness instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147.

---

[5] Latraya testified that she needed to move because she was slashed and threatened.

\* \* \*

We have considered Wilson's remaining arguments and conclude that they are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court