THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CHARLES A. BAUER, Appellant.

Second Department, December 30, 1985

**APPEARANCES OF COUNSEL**

*W. Alexander Melbardis* for appellant.

*Patrick Henry, District Attorney (Steven A. Hovani* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

On this appeal, the principal issue dividing this court concerns the sufficiency of the evidence of the defendant's guilt of robbery in the first degree. Viewing the evidence, as we must, in a light most favorable to the prosecution, giving it the benefit of every reasonable inference to be drawn therefrom *(see, Jackson v Virginia,* 443 US 307, 319; *People v Lewis,* 64 NY2d 1111, 1112; *People v Malizia,* 62 NY2d 755, 757, *cert denied* — US —, 105 S Ct 327; *People v Contes,* 60 NY2d 620, 621), we conclude that the defendant's guilt was proven beyond a reasonable doubt. There being no other issues warranting reversal, we affirm the conviction.

On January 22, 1979, shortly after 9:30 A.M., a robbery occurred at the Smithtown branch of the National Bank of North America (the bank). Later that day, the defendant, Charles A. Bauer, a member of the Nassau County Police Department, was arrested and charged with committing the robbery.

The defendant has been tried three times in connection with this case. The first trial resulted in a conviction which was subsequently reversed by this court because of an error in the charge to the jury *(see, People v Bauer,* 83 AD2d 869). The second trial ended in a mistrial because the jury was unable to agree on a verdict. The third trial resulted in the instant conviction for robbery in the first degree, which conviction is the subject of this appeal.

The evidence presented at the third trial has been extensively, albeit, selectively reviewed by the dissent. Suffice it to say that the evidence linking the defendant to the robbery consisted of the testimony of several persons, i.e., a bank customer and bank employees, which testimony established that the defendant was the person who committed the robbery at the bank. Specifically, Barbara McCormick, a bank customer, identified the defendant at two lineups (with the participants seated) which were held on the day the crime was committed, and at the trial. Her testimony placed the defendant in the parking lot in front of the bank shortly before and after the robbery.

A bank manager trainee, Mary Alice Blanchet, testified that

the defendant resembled the person who entered the bank on the day in question at approximately 9:40 A.M., displayed a weapon, and ordered bank employees to fill a bag with money which he took with him when he left the bank. Some two weeks after the robbery, Ms. Blanchet viewed a lineup but did not make an identification. However, the next day she contacted a detective assigned to investigate the robbery and informed him that she could identify the person she thought she had seen in the bank. Ms. Blanchet subsequently identified the defendant as that person.

A third witness, Margaret Horn, who was a teller at the bank, identified the defendant as the masked person who ordered her at gunpoint to put $4,200 into a bag. Ms. Horn thought that, because of his physical appearance (height, weight, etc.), she knew the robber as a bank customer. The defendant, who was in fact a bank customer and who regularly spoke with employees, was seen by Ms. Horn in the bank approximately one month after the robbery. She compared the defendant's height, build, and manner of walking with those of the robber, and concluded that the defendant and the robber were one and the same person.

More incriminating was the testimony concerning the getaway car. John Wurzler, the acting branch manager, was present in the bank when the robbery occurred. He followed the robber out of the bank and into the parking lot in front of the bank. Though he momentarily lost sight of the robber, Mr. Wurzler saw him enter a late model black Mercury Cougar with sports wheels and an antenna on the vehicle's left rear side. According to Mr. Wurzler, the license plate number was "171 ABJ".

Bruce Morin, who was making the morning "drop" for the Genovese Drug Store at the bank's outside deposit box when the robbery was taking place, saw a man exit from the bank, and begin to pull a mask off his head. The man looked in Mr. Morin's direction and then started to run across the parking lot. Mr. Morin followed the man into the parking lot and, at a distance of 12 to 15 feet, saw him enter a 1978 Mercury Cougar, which had a left rear antenna. Initially he stated that the vehicle was blue but later testified that it was black. Mr. Morin identified the defendant as the person he saw enter the Cougar. Mr. Morin was also able to see the vehicle's license plate bearing the number "171 ABJ". However, he testified that the "J" could have been a "T".

A few hours after the robbery, Mr. Morin was driven by some detectives to an area where he identified the vehicle he had seen pull out of the parking lot. The vehicle's license plate number was "171 ARJ"; however, most importantly, the plate was bent at the bottom of the fifth character, viz., under the "R".

Later that day, Mr. Morin was transferred to another vehicle and was taken to New Mill Road. He saw some automobiles parked down the road but was unaware that the Cougar was among them. From a distance of at least 500 feet,[1] Mr. Morin saw a group of people emerge from a house and enter a vehicle. The defendant, who had just been arrested inside his house at 84 New Mill Road, was one member of that group. However, Mr. Morin was unable to differentiate among the group members. Mr. Morin was thereafter asked to view two lineups, and upon doing so he identified the defendant. According to Mr. Morin, there was no chance that he could be mistaken about his identification.

A police check on the vehicle and license plate disclosed that a 1978 black two-door sedan Mercury Cougar, license plate number "171 ARJ", was registered in the defendant's name, at 84 New Mill Road, Smithtown, New York; the investigation disclosed no other Mercurys with "171" in the license plate number. According to one of the defendant's witnesses, Margaret Soriano, the license plate on the defendant's Cougar was bent several days after he acquired the car; in any event, the plate was bent before January 22, 1979. The defendant admitted that he owned a motor vehicle matching the description of the Cougar bearing license plate number "171 ARJ".[2]

Testimony was also presented by the prosecution concerning the weapon which was displayed during the course of the commission of the robbery. The weapon which was seized from the defendant's home at the time of his arrest, and later introduced into evidence at the trial, was identified by John Wurzler, Mary Alice Blanchet, and Margaret Horn as being similar to the one which was displayed during the robbery.

The perpetrator was described by the People's witnesses as

---

1. Morin testified that the distance was at least 1,000 feet; one of the detectives testified that the distance was 500 feet.

2. Several witnesses, most of whom were employed by the New York State Department of Motor Vehicles, testified concerning the existence and possible whereabouts of license plate number "171 ABJ", and license plates beginning with "171 A—".

wearing distinctive clothing. John Wurzler testified that the robber wore a three-quarter length leather-type jacket with a light bleach or paint stain on the middle back, and blue jeans with a bleach or paint stain on the right leg. Some five weeks later, when Mr. Wurzler saw him in the bank, the defendant was wearing dungarees and a black leather jacket similar in appearance to the jacket and pants worn by the perpetrator. Linda Straub, a bank employee who witnessed the crime, testified that the perpetrator was wearing a black waist-length leather jacket and faded jeans. There was a baby-blue paint-type stain on the back of the jacket. Defendant admitted that he had owned a black leather jacket. However, according to his testimony, defendant allegedly discarded the leather jacket sometime in 1976 after his house had been burglarized and the perpetrators splattered lime green paint on the jacket.

The defense was essentially twofold: alibi and mistaken identity.[3] The alibi defense was presented by three witnesses, namely, the defendant's wife, Beverly Bauer, a close friend and neighbor, Linda Caracci and Mrs. Caracci's housekeeper, Maureen Forde. These witnesses attempted to establish that the defendant was at home when the robbery occurred. Given the jury verdict of guilt, it is clear that these witnesses, who, because of their interest in the outcome of the case or because of the inconsistencies in their testimony, were successfully impeached by the prosecution. Mrs. Bauer testified that on the date of the robbery, she awoke shortly before 9:30 A.M. and had coffee with the defendant after which he went downstairs while she dressed. The telephone allegedly rang at approximately 9:40 to 9:45 A.M., but Mrs. Bauer did not answer it. Mrs. Bauer further testified that she rejoined her husband in the kitchen at approximately 10:15 A.M. and they left the house at 10:30 A.M.

Mrs. Caracci similarly testified that she telephoned the Bauer residence on the morning of January 22, 1979 and spoke with the defendant. At trial, Mrs. Caracci estimated that the telephone conversation occurred between 9:40 and 9:45 A.M.

The time sequence as presented by Mrs. Bauer's and Mrs. Caracci's trial testimony was sharply contradicted by that offered by the police officers who conducted an investigation shortly after the robbery. Detective Kozen testified on rebuttal

---

3. Evidence of the defendant's reputation for honesty, integrity and peacefulness was also presented.

that when he interviewed Mrs. Bauer at her home on the afternoon of January 22, 1979, the day the robbery occurred, she stated that she had gotten up at approximately 10:00 A.M. that morning. Similarly, Detective Romano testified that during his interview with Mrs. Caracci a few hours after the robbery, she stated that her telephone conversation with defendant that morning occurred at approximately 9:00 to 9:15 A.M. Under this latter time sequence, the defendant could still have committed the robbery since the prosecution's evidence established that the bank was only five or six minutes in driving time away from the Bauer residence.

Mrs. Forde's testimony was offered to substantiate the fact that Mrs. Caracci had spoken to the defendant by telephone on the morning of January 22, 1979. Mrs. Forde, however, was impeached by the fact that she did not recall the telephone call until the defendant brought it to her attention more than a month after the robbery.

The defense also sought to establish that the defendant was the victim of misidentification. Linda Caracci's husband, Joseph, and Mrs. Bauer, testified that on the day in question they saw someone resembling the defendant drive past the defendant's house in a beige automobile. In addition, the defense attempted to exploit the variances among the descriptions of the perpetrator given by the prosecution's witnesses, as well as the conflicts between those descriptions and the defendant's appearance after his arrest, and at the trial, including the fact that when arrested the defendant had a scar on his nose. Apparently none of the witnesses mentioned the scar in their descriptions.

It is well established that the standard for reviewing the legal sufficiency of the evidence in a criminal case is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the defendant's guilt of the charged crimes had been proven beyond a reasonable doubt (see, *Jackson v Virginia,* 443 US 307, 319, *supra; People v Lewis,* 64 NY2d 1111, 1112, *supra; People v Malizia,* 62 NY2d 755, 757, *supra; People v Contes,* 60 NY2d 620, 621, *supra).* As the United States Supreme Court noted in *Jackson v Virginia (supra,* at p 319): "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the

evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law". Accordingly, the function of an appellate court is not to substitute its judgment for that of the jurors on matters of credibility or the weight to be accorded to the evidence presented at trial. In setting forth the heavy weight which is to be accorded a jury's verdict the Court of Appeals has stated: "[b]etter than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused" *(People v Cohen,* 223 NY 406, 423; *see also, People v Kennedy,* 47 NY2d 196, 202-205; *People v Joyiens,* 39 NY2d 197, 203; *People v La Borde,* 76 AD2d 869, 870; *People v Majeer,* 100 AD2d 830, 831).

In the case at bar our distinguished dissenting colleague, having read the same testimony heard by the jury and found by it to have established the defendant's guilt beyond a reasonable doubt, nevertheless concludes a "reasonable doubt" exists. The dissenter's conclusion is based primarily on what he perceives are fatal inconsistencies and conflicts in the testimony and the "incredible" nature of some of the prosecutor's witnesses' testimony. In essence, what our dissenting colleague has done is to constitute himself a thirteenth juror *in absentia* and vote against the conviction. In doing so, he chooses to ignore the well-settled principles of law set forth above regarding the scope of appellate review in criminal cases. As this court recently reiterated in *People v Di Girolamo* (108 AD2d 755): "Minor discrepancies between the testimony of witnesses is not sufficient to show that a witness's testimony was incredible as a matter of law *(People v Gruttola,* 43 NY2d 116; *People v Rosenfeld,* 93 AD2d 872). Credibility is a matter reserved exclusively for the jury *(People v Concepcion,* 38 NY2d 211; *People v Rosenfeld, supra)* and we are traditionally resistant to second-guessing its determination on this issue *(People v Rodriguez,* 72 AD2d 571)" *(see also, People v Andrews,* 112 AD2d 1002). And as stated in *People v Rodriguez* (72 AD2d 571) "[t]he resolution of questions relating to the credibility of witnesses is properly a function of the jury and said determination may not be overturned lightly on appeal".

Our dissenting colleague also places great emphasis on the slight variance in the original description of the license plate

attached to the defendant's auto, which auto, coincidentally, closely matched the description of the perpetrator's auto. As previously noted, the license plate on the defendant's vehicle was bent under the fifth character. This indentation in the plate would clearly explain why the prosecution's witnesses may have thought they saw a "B" rather than an "R" in the license plate of the robber's vehicle. In any event, the dissenter, contrary to settled law, is again attempting to second-guess the trier of fact and substitute his judgment for that of the jurors. Based upon the assessment of the evidence in the record and viewing the same in a light most favorable to the prosecution, as we are obliged to do (see, Jackson v Virginia, 443 US 307, 319, supra; People v Contes, 60 NY2d 620, 621, supra), we are led to the inexorable conclusion that the jury's verdict, that defendant's guilt of robbery in the first degree was proven beyond a reasonable doubt, must be affirmed.

Nor are we disturbed by what the dissent perceives to be a violation of the defendant's right to due process in that shortly before he identified the defendant at a lineup, Bruce Morin saw a group of people, which group included the defendant, at a distance of at least 500 feet. The witness, as acknowledged by the dissenter, stated that, in view of the great distance, he could not distinguish the group members or their clothing. We need spend little time answering a contention that a lineup identification procedure is fundamentally unfair, or that a witness' identification is unreliable, because the defendant, as one of a group, was exposed to that witness' view, sometime prior to the lineup, at a range obviously far too distant to be able to discern or recognize with the naked eye an individual who is in the group.

Finally, with regard to the court's charge on alibi, we note our disagreement with the dissent as to whether the issue raised on appeal was properly preserved for our review. From all that appears in the record, defense counsel did not request the court to charge that the People bear the burden of disproving alibi beyond a reasonable doubt (see, People v Victor, 62 NY2d 374), nor does it appear that he objected to its omission, and the dissent acknowledges as much. Under these circumstances, we conclude that the issue concerning the sufficiency of the court's charge on alibi had not been properly preserved for appellate review (see, CPL 470.05 [2]; People v Hoke, 62 NY2d 1022; People v Little, 62 NY2d 1020; People v Walker, 104 AD2d 573). Nor do we consider this issue ground for reversal in the interest of justice (see, CPL 470.15 [3] [c])

given the trial court's instructions which, taken as a whole, adequately conveyed to the jury the applicable law governing its deliberations *(see, People v Canty,* 60 NY2d 830, 832; *People v Russell,* 266 NY 147, 153). Indeed, the court included the following as part of its over-all charge to the jury:

"In this case the defendant has presented evidence in support of his contention that at the time of the bank robbery he was at his home at 84 New Mill Road in Smithtown and could not, therefore, have committed the crime charged at the National Bank of North America, a number of miles away. This is what the law calls an 'alibi'.

*"The presentation of this evidence places no burden whatsoever on the defendant to prove the truth of such alibi.* As I previously instructed you, the burden—*the responsibility—is on the People to prove beyond a reasonable doubt that the defendant Charles Bauer is the man who was in the National Bank of North America that morning and who committed the crime charged. Should you not believe the alibi evidence, you may not find the defendant guilty just from the fact alone. Even under those circumstances the People still have the overall burden, ladies and gentlemen, of establishing to your satisfaction, beyond a reasonable doubt, that the defendant Charles Bauer is the person who committed the crime charged.* If the alibi evidence presented by the defendant in this case raises a reasonable doubt in your minds as to the defendant Charles Bauer being the person who committed the crime charged then the People would have failed to meet their burden of proof and the defendant, under such circumstances, must be found by you to be not guilty" (emphasis added).

In conclusion, we reiterate that while the trial testimony presented by the prosecution contains certain discrepancies, as stated by our dissenting colleague, we do not perceive our function as mandating us to substitute our judgment for that of the jurors *(see, People v Majeer,* 100 AD2d 830, *supra).* Resolution of the issues of credibility, as well as the weight to be accorded to the evidence presented, are properly within the province of the trier of fact whose determination should not be overturned lightly on appeal *(see, People v Gruttola,* 43 NY2d 116). Since the record herein contains sufficient evidence in quantity and quality to support the verdict of guilt and "bearing in mind that credibility is a matter to be determined by the trier of the facts", our review function is exhausted and affirmance is required *(see, People v Malizia,* 62 NY2d 755, 757, *supra).*

We have reviewed the defendant's remaining contentions which have been preserved for our review and find them to be lacking in merit.

O'CONNOR, J. (dissenting). At about 9:40 o'clock in the forenoon of the 22nd day of January 1979, a man wearing a ski mask and carrying a silver-colored revolver entered the National Bank of North America (NBNA) located in Smith-town, New York. Except for cutouts for the eyes and the mouth, the face and head of the intruder were covered down to his shoulders. Tossing a white canvas bag to the tellers, he ordered them to fill it with money and to remain quiet for five minutes before calling the police. He then turned and ran out of the building.

The ensuing investigation turned up two witnesses who allegedly saw the robber rushing from the bank, clutching a white canvas bag in his hand, running through the parking lot and passing momentarily out of sight behind a parked white truck. They then saw him at the wheel of a black automobile as the car backed up and pulled out of the lot with screeching tires, ran through traffic and turned south onto Route 111.

The witnesses, Wurzler and Morin, each testified that he saw a rear license plate number "171 ABJ" on the automobile which they each said was a Mercury Cougar. A computer check with the Department of Motor Vehicles quickly established that no such plate was then outstanding but that a black 1978 Mercury Cougar with New York registration 171 ARJ was registered to an individual living in the Town of Smithtown in the County of Suffolk. His name was Charles A. Bauer.

Later that same afternoon, appellant Charles A. Bauer, a 12-year member of the Nassau County Police Department, was arrested and charged with the armed robbery of the bank.

An indictment quickly followed and by judgment rendered on April 18, 1983, appellant was convicted of robbery in the first degree and sentenced to an indeterminate term of imprisonment with a maximum of nine years and a minimum of three years.[1]

---

1. On April 1, 1980, upon the same facts and following a jury trial, appellant was convicted of robbery in the first degree but the judgment was reversed by this court (People v Bauer, 83 AD2d 869).

Upon the same facts, appellant's second trial resulted in a mistrial because the jury could not arrive at a verdict.

It is from that judgment of conviction that appellant appeals. The appeal brings up for review the denial of certain branches of defendant's pretrial motion which sought suppression of the lineup identifications and certain physical evidence. My confreres of the majority affirm the judgment and agree with the denial of suppression. I respectfully disagree and would reverse on both counts.

Appellant Charles A. Bauer lived with his wife and two children in Smithtown, less than four miles distant from NBNA, and for some years before the crime, maintained an active checking and savings account in NBNA and appeared in the bank on a regular weekly basis to conduct routine banking business, i.e., cash checks, make deposits and make withdrawals, etc. Appellant knew the bank personnel and they knew him on sight and by name and, indeed, referred to his wife by her first name, Beverly.

Within a short time following the crime, the police in numbers, arrived at NBNA and began taking sworn statements—10 in all—from witnesses who related what they observed and described the perpetrator.

Some of the usual and expected variances appear in the description of the perpetrator. But then again, some of the conflicts appear to be quite significant.

For instance:

(1) The police department arrest record of appellant indicates scar on the left side of defendant's nose. Not in their statements nor at trial did any witness even mention the scar.

(2) The perpetrator's age varied from teen-ager through the twenties; appellant was 36. His height varied from five feet six inches to six feet; he is actually six feet tall.

(3) The perpetrator's hair color ran from platinum blond to light sandy brown. Before the trial, on the day of arrest and at trial, appellant's hair was dark brown.

### THE EYEWITNESS TESTIMONY

From the pen of an obscure author there comes, from long ago, a faintly familiar verse:

"Tender-handed stroke a *nettle*,[2]
And it stings you for your pains;

---

2. Any plant of the species Urtica, having toothed leaves covered with hairs that secrete a stinging fluid that affects the skin on contact (American Heritage Dictionary).

Grasp it like a man of mettle,
And it soft as silk remains".

The nettle that here confronts us, as I now suggest that this judgment of conviction be reversed, is the traditional, rational, respected and generally binding rule that "on the review of a conviction in a criminal case where there is any evidence of guilt, the question of reasonable doubt must be left to the jury * * * and the verdict or decision on the facts must ordinarily be deemed conclusive and will not be disturbed *unless it is perfectly clear that it is against the weight of the evidence"* *(People v Atlas,* 183 App Div 595, 600, *affd* 230 NY 629, cited with approval in *People v Joyiens,* 39 NY2d 197, 203; emphasis added). Hence, we are obliged to review the entire record to determine whether the evidence is sufficient in quality and quantity to justify the jury's finding of guilt beyond a reasonable doubt *(see, People v Reed,* 40 NY2d 204; *People v Santos,* 38 NY2d 173). And it is, of course, fundamental that if, upon such review, we find the record to be deficient, we are obliged to set aside the finding of guilt *(see, People v Santos, supra).* It cannot be gainsaid this court is empowered not only to reverse a judgment of conviction based upon a determination that there is a lack of legally sufficient evidence *(see,* CPL 470.15 [4] [b]), but it may also weigh the evidence and, if appropriate, reverse a judgment based upon a factual determination that the verdict is against the weight of the evidence *(see,* CPL 470.15 [5]; *People v Carter,* 63 NY2d 530). I find that this is such a case.

I now "grasp" the nettle firmly and flatly declare that in the totality of the facts before us, the verdict of the jury is contrary to the weight of the evidence. And so, I ask my confreres to have the patience and to take the time to join in a cold, critical and objective analysis of that testimony of the witnesses who "positively" identified appellant as the perpetrator of this crime.

### MARY ALICE BLANCHET

The record indicates rather clearly that the perpetrator was wearing shoulder length hair. Indeed, Wurzler, the bank manager, testified that he saw a strand of blond hair hanging below the ski mask. It is, therefore, crucial to note that this witness, Blanchet, observed the perpetrator as he entered the bank and *before* he pulled down the ski mask.

That the hair of the perpetrator was blond and *not* brown (as intimated repeatedly by the People) is forcefully and dramatically demonstrated by the testimony of this witness.

First of all, in her statement of January 22, verified that same day, Blanchet described the perpetrator as white, male, about 25 years of age, 5 feet 11 inches tall with a thin build, fair complexion and *blond hair and moustache.*

The witness flatly stated that the hair of the perpetrator was "not brown curly hair [but] * * * blonde curly" hair. She said that the hair of the perpetrator as she remembered it was lighter than the hair of the defendant and finally disclosed the following:

"Q * * * [y]ou didn't really identify him as being the individual who robbed the bank but as the one who most closely resembled the individual? Is that correct?

"A Yes.

"Q You never said it was this man. It just resembled him?

"A This is the man who looks like the man who robbed the bank.

"Q But it is not the man?

"A I don't know".

This totally worthless identification was highly prejudicial and is sufficient in neither quality nor quantity to justify the jury's guilty verdict beyond a reasonable doubt. MARGARET HORN

An employee of NBNA, Horn had on many occasions seen appellant at close range in face-to-face encounters as she waited on him at the bank prior to the robbery. From personal observation, she knew well that his hair was dark brown, neither blond nor light in color. On January 23, she read in the local paper that appellant had been arrested and charged with the robbery. She talked about his arrest with the girls at the bank; she discussed it with her husband, with the police in general and Detective Keichlen in particular; yet, in her testimony at trial, she persisted that she did not recognize appellant at all, until she saw him walk into the bank on February 27, more than five weeks after the crime. A strange story indeed.

In her sworn statement of January 22, she added little or nothing to the identification process. She gave a broad general physical description which would fit countless numbers of men and then said that he had dark brown very sad eyes. She repeated this testimony at the trial and conceded that many, many people had very, very sad eyes!

It is submitted that this testimony, which is "positive" of

nothing and which "identifies" nobody, possesses neither the quality nor quantity to sustain the jury's verdict which, under these circumstances, is contrary to the weight of the evidence.

### BARBARA MCCORMICK

The statement of this witness, dated January 22 and drafted by the police, said, in substance, that she was sitting in her automobile parked outside of the bank when she noticed a man walking towards the bank as she was counting her money. Her trial testimony, however, is much more dramatic and creates innumerable problems as to the veracity of her identification.

At trial, she said that the instant she first saw the man, some 50 feet away, approach diagonally across the parking lot, she immediately became frightened and felt "as if he was staring through me". At least three times, she repeated that she sat there frozen and "I stared at his face and I could not take my eyes off of him". She testified that the man's jaw was clenched and his eyes were staring right through her. It all took about 15 seconds.

As the man walked past her, six feet away, his left profile was facing her but she did not notice any scar. Through the rearview mirror, she saw him stop, make a complete 180 degree turnabout so that he was again facing her and she saw him "dip * * * down" and stare in at her. He then turned around again, walked to the bank and entered it.

This emotionally charged recital is incredible on its face. Would any man—be he cop or crook—knowledgeable in the ways of crime or criminals, literally standing on the doorstep of the bank he is about to rob at gunpoint so deport himself as to practically guarantee that there will be a witness to his activities? McCormick's recital is one of incredible fright amounting to terror and verging on hysteria. Her emotional disturbance was not caused by anything the man said or did but was entirely subjective with the witness who found his eyes to be "staring through me". Could this unfortunate woman, in these moments of severe emotional distress, make an intelligent positive identification of the man who robbed the bank? It is indeed extremely doubtful. She identified appellant as that man. These facts in no way denigrate or infer any wrongdoing by Mrs. McCormick. She undoubtedly is thoroughly convinced of the veracity of her statements. She certainly is not lying but is it not entirely clear that she could be in total error in her identification of appellant? This is the

curse of eyewitness identification—the witnesses are not lying but they are so often mistaken.

For reasons difficult to comprehend, Mrs. McCormick and Bruce Morin were permitted later that day to sit together waiting to view a lineup. Over a quick lunch in a basement room of the Fourth Police Precinct, they talked together unsupervised and unattended[3] (a clear violation of proper police procedures).

### THE GETAWAY CAR AND ITS LICENSE PLATES

The conclusion, swiftly arrived at, that the getaway car was a 1978 black Mercury Cougar, registered in the name of Charles A. Bauer, at first blush seems to make sense and to hang nicely together. However, the record presents many unanswered questions and poses numerous problems.

The two principal witnesses to identify the car were Morin and Wurzler. Let us review briefly the events that followed as the robber ran from the bank.

Morin, an 18-year-old employee of Genovese Drugs, was on the way to the bank when he saw the perpetrator run from the NBNA and get into a black Mercury 1978 two-door sedan. He testified that he was but six feet behind the car as it took off out of the parking lot, and he noted the rear license plate to be 171 ABJ. Subsequently, at the suggestion of a policeman, he said that the "J" might have been a "T". Morin said he called the number to Wurzler, the bank manager, who was standing in front of the bank holding the door. On the other hand, Wurzler said he saw the perpetrator get into a black car and, as it rushed out of the parking lot, he noticed the rear plate with the number 171 ABJ. He testified that the car was about 40 and 65 feet away from him at the time. Wurzler denied that the license number was called to him by anybody and says he saw the plate himself.

In any event, both witnesses must have been mistaken. The correct number allegedly was not 171 ABJ as suggested Wurzler or 171 ABT as alternately stated by Morin, but 171 ARJ, as determined by the police.

---

3. That same evening, Mrs. McCormick suddenly realized that her boots had high heels and she changed her estimate of the perpetrator's height from five feet six inches tall to five feet nine inches tall.

It should be noted that Detective Romano also testified that Mrs. Carol Fisher, never called as a witness, described the perpetrator as five feet six inches tall and 145 pounds.

Assuming, arguendo, that the first four digits 171 A—were correctly reported, in view of Morin's intransigence as to the "J" or the "T", and the error of both witnesses as to the "B", was not a continuing intensive investigation indicated? Were there other plates out there in the 171 series—lost plates, stolen plates, expired but not surrendered plates? Plates floating around accessible and possibly available to those bent on doing evil? The meager record here does little or nothing to dispel such thoughts, and it is difficult not to conclude, from the record, that once appellant's plate number surfaced on the computer printout, all police investigation came to a grinding halt. It was no surprise, for example, when People's witness Morton M. Fass, Supervising Investigator of the Department of Motor Vehicles, admitted on cross-examination that the Department had neither record nor knowledge of the present whereabouts of a plate issued in 1973 to a black Mercury, license plate bearing number 171 ABJ, and it is curious that at no time was a teletype alarm ever sent out for a Mercury bearing number 171 ABJ. For all intents and purposes, the investigation was officially closed.

Defense witness Stolworthy testified that he never surrendered his 1975/1976 plates, license number "171 ARH" or "171 ARJ", to the Department of Motor Vehicles but threw them away in fairly good condition.

The testimony of William Blaber, a Department of Motor Vehicles employee, Allan Hettrick, a computer expert, both for the People, and Sharon Titcomb for the defense, all agreed that from the record, it was not possible to determine whether both plates of any one set marked "surrendered" had in fact ever been turned back to the Department.

This testimony is highly significant and pregnant with possibilities. How many "171A" series plates are still in circulation; plates taken, for example, from abandoned or destroyed automobiles? It is beyond dispute that a conviction predicated solely upon the testimony regarding the license plates could not be sustained. It follows that without proper identification of appellant as the perpetrator the judgment must be reversed.

### THE ALIBI
#### CHARLES A. BAUER

Appellant took the stand in his own behalf and denied having robbed the NBNA. As part of his background, he said

that he had served four years in the United States Marine Corps, receiving an honorable discharge, and that he had served on the Nassau County Police Force for approximately 13 years. He said he never owned a ski mask or, for that matter, that other than his uniform hat, he never owned a hat at all. As the result of a cancer operation in August 1978, he had a scar on the bridge of his nose.

On January 22, he arose at about 8:30 or 8:45 A.M. He walked his children out to a school bus about 9:10 A.M., and while putting out the garbage at about 9:25 to 9:30 A.M., he noticed a green automobile moving slowly past his house. The car, driven by an older woman,[4] made a U-turn and slowly came back and parked in the driveway next door.

At about 10:30 A.M., he and his wife drove to Macy's in the Smith Haven Mall.

He testified that, as a street cop, he wore long hair, a beard and a moustache and because of his undercover work, he had authority to use canceled license plates of 12 different States which he switched at will on his official police car on the theory that out-of-State plates would attract less attention.

Because his finances were questioned by the prosecution, he testified that on January 22, before leaving his home at 10:30 A.M., he received a phone call from the Hard Scrabble Realty Co. offering him $15,000 for a piece of real property that he then owned. The telephone company records verify that a call was made on that morning and at that time from Scrabble to Bauer.

His salary as a policeman was then approximately $28,000 per year. He had no debts and readily admitted on cross-examination that more than $120,000 had passed through his bank account in the previous two years. Included in that figure was $56,000 in collected insurance claims and $90,000 representing the balance of a joint bank account standing in the names of himself and his father. Upon his father's death in 1975, and following his instructions, that money was distributed between himself, his two brothers and a sister, each receiving approximately $22,000.

#### BEVERLY BAUER

Mrs. Bauer testified that on January 22, she awoke before

---

4. It came to pass that the driver of that car, a total stranger, became the prime alibi witness and fixed the time at 9:25 A.M.

9:30 A.M. Her husband was home and he brought coffee up to the bedroom. He told her of a telephone call from Linda Caracci who said she wanted to know if she, Mrs. Bauer, would take her car when the two of them drove to the travel agency later that day.

She verified the telephone call from Hard Scrabble and told of their trip to Macy's and said they returned home at about 11:45 A.M.

At about 12:30 P.M., Beverly Bauer and Linda Caracci drove the Mercury Cougar (the alleged getaway car!) to meet Margaret Soriano. They drove first to the NBNA shopping center—scene of the crime—where Linda cashed a check, and then went on to the Ginger Peachy Travel Agency where they met Margaret Soriano who had arrived 15 minutes earlier. Shortly thereafter, two men whom they did not know came into the room and they were still there as the women departed.

Mrs. Bauer and Mrs. Caracci drove straight home, parking the Cougar in the Bauer driveway. Each woman went to her own house. Charles Bauer met his wife and told her that Mrs. Soriano had just telephoned to advise that Mrs. Bauer and Mrs. Caracci had been followed from the agency by the two men and she thought that they had guns. Beverly did not think they were policemen, and, searching for some kind of an answer, her husband had inquired as to whether she had been in any accident. They both went outside to examine the car for dents and found none. Shortly thereafter, the police arrived in force, many police cars, men with shotguns, helmets and rifles and "they just ran up my driveway".

Mrs. Bauer testified that her house was under constant police guard until a search warrant arrived at about 10:00 P.M. that evening. The police searched the house, ripped up the garden, tore apart the carpeting, searched the two cars, the garage, a shed, and even ripped apart the cement coping around the swimming pool. The search was completed at 12:30 A.M. and nothing was found. No ski mask, no stained jacket, no jeans and no proceeds.

According to Mrs. Bauer, they had no financial problems and no outstanding debts.

#### HENRY KOZEN, DETECTIVE

In rebuttal, Detective Kozen said that he spoke to Beverly Bauer early on January 22 and that, in response to questions, she replied that she had awakened later than 10:00 that

morning. Kozen admitted that these alleged statements were not reduced to writing.

### BEVERLY BAUER

In surrebuttal, the witness testified substantially:

"Q Do you recall being asked what time in the morning you awoke?

"A Yes.

"Q What did you respond?

"A My first responses was, 'Well, I got up before 10:00, and, like, he was sitting right next to me and said, Well, can't you be more specific about that? and I said, Well, now that you ask, 9:30 and I said, In fact, it was even before 9:30 because I had my clock set and I got up before my clock went off' ".

### LINDA CARACCI

A next door neighbor, a registered nurse and the wife of a retired New York City police detective, Linda Caracci, testified for appellant.

In sum total, she said that on the day of the crime, Maureen Forde, a cleaning woman, was supposed to report for work at 9:30 A.M. She remembered the date and that time clearly because Mrs. Forde commented that, as this was her first day, she was a little early. Shortly after Mrs. Forde's arrival, her friend, Margaret Soriano, telephoned to discuss a proposed Las Vegas trip, and they talked for some five minutes. The witness then telephoned Charles Bauer and told him to ask his wife Beverly to use her car that day for the drive to the travel agency. Later, Beverly Bauer drove to the agency in the 1978 Cougar automobile (allegedly the getaway car). She denied telling Detective Romano that she spoke to appellant between 9:00 and 9:15 that morning.

### ANTON PRAVETZ, DETECTIVE

In rebuttal, the detective testified that in his presence Detective Romano told Mrs. Caracci that the robbery had occurred at approximately 9:00 A.M. and Caracci replied that she was on the phone with appellant between 9:00 A.M. and 9:15 A.M.

No written record of these alleged conversations was ever made—a departure from standard police procedure.

## MARGARET SORIANO

The gist of this witness' testimony was that she met Mrs. Caracci and Mrs. Bauer at the Ginger Peachy Travel Agency and that two men appeared to be following the women as they left the agency to go home. She thought one might be carrying a gun and she telephoned appellant to tell him what was going on.

## MAUREEN FORDE

This witness testified that on January 22, 1979, she arrived at the home of the Caraccis to begin the first day at work. She was to start at 9:30 A.M. but, because it was her first day, she made a point to arrive about 9:25 A.M.

Because she was unfamiliar with the neighborhood, she was driving very slowly and she noticed a man putting garbage out in front of the house next to the Caraccis' home. She identified that man as Charles A. Bauer. The witness verified the telephone call received by Mrs. Caracci from Mrs. Soriano (maybe five minutes in duration), and she stood by as Caracci talked on the phone for maybe 7 to 10 minutes, to "Mickey" and to herself, she said "she's not talking to her girlfriend, she's talking to a man". That man was appellant Charles A. Bauer, known to his friends and acquaintances as Mickey; and a line-by-line reading of the record indicates that the time had to be between 9:35 and 9:45 A.M.

## IN BRIEF REVIEW

At the crime scene, 10 statements were taken by the police but only five witnesses said they could identify the perpetrator and they were called to view a lineup.

(1) *Mildred Meyer*—She said no one in the lineup looked familiar. She was called as a defense witness.

(2) *Mary Alice Blanchet*—In response to a specific question, she said she *did not know* whether appellant was the perpetrator. Her testimony was totally insufficient as a matter of law.

(3) *Margaret Horn*—She identified appellant as the perpetrator by his "very sad eyes"—completely insufficient in both quality and quantity, as a matter of law.

(4) *Barbara McCormick*—The highly emotional and almost hysterical state of the witness' mind leads to the conclusion

that her identification as a matter of law was insufficient to go to the jury.

(5) *Bruce Morin*—Now we come to Bruce Morin, who admitted he saw the perpetrator's face for *one, possibly two seconds.*

## THE JANUARY LINEUP

It had obviously been a great day in the life of young Morin who became an immediate star in a real cops and robbers drama. He spent the day riding around in a police patrol car, looking at Rogues gallery pictures and fascinated by the conversation over the police radio as the search for the perpetrator began to zero in on Charles A. Bauer.

When we last saw Morin, he was in a caravan of police vehicles traveling from the Ginger Peachy Travel Agency to appellant's home on New Mill Road.

The direct examination of Morin is brief and leaves out much more than it includes. The witness merely says that he was in a police car parked in a residential area in Smithtown and that about 4:00 P.M. that afternoon, he was taken to a lineup in the Fourth Police Precinct.

On cross-examination, however, a far more interesting and intriguing story unfolded and it turned out that the "residential area" was in fact the immediate neighborhood where appellant lived.

Morin testified that he saw police vehicles converging on 84 New Mill Road (appellant's home), and as the tempo of police action increased, he was put in another police car which drove around the corner and onto New Mill Road, facing in the direction of appellant's home, approximately 500 feet distant and now in Morin's direct view.

At this point, the color of the perpetrator's hair as described by various witnesses, was platinum or blond, or at least of a light shade. Not one single witness said it was dark. Obviously, it would be of immeasurable help for Morin to know first hand whether the suspect's hair was blond (as he had previously described it) or brown, as indeed appellant's was in fact before, during and after the crime. If it just happened that he was also to see appellant being led out of his home in police custody, it would indeed make it that much easier for him to pick the culprit out of the lineup which was about to take place. Like taking candy from a kid!

On cross-examination, the witness repeatedly replied that

he could not recall if the three people he saw come out of that house (84 New Mill Road), had gotten into a car or not, nor could he distinguish them or their clothing.

To clarify and emphasize the importance of this phase of the trial, we go to the testimony of Detective Dennis Romano. Romano told Bauer that a bank robbery had occurred "this morning and that a black Cougar was used with a similar plate number and that is why we were here, we wanted to know where the car was that morning". A somewhat friendly conversation ensued concerning a case on which both officers had worked some years before and appellant, entirely at his own volition, opened a cabinet in the kitchen to show Romano some uniform patches. Inside the closet, in clear view, Romano saw a silver-colored revolver. The *Miranda* rights were promptly read to appellant and he was permitted to call a lawyer on the telephone.

At this point, Romano went outside and watched as appellant came out flanked by two detectives.

Repeated efforts by defense counsel to cross-examine Romano concerning the length or the color of the detectives' hair or as to their height were objected to and largely sustained.

This was indeed a crucial moment in the delicately balanced process of eyewitness identification. It was not as Criminal Term insisted a question of what *Morin* saw or what he thought or did *but clearly the issue was, what would the jury conclude that Morin saw and knew and did.* When Morin did not see platinum-blond hair on any of the three men, did he "adjust" his thinking and conclude that the perpetrator's hair was not really brownish blond, as he first reported, but dark brown? And if so, would not that totally vitiate the integrity of the lineup? Was this not a clear violation of due process? I think so.

The severe and unreasonable curtailment of cross-examination of both Morin and Romano clearly prevented the jury from getting the facts necessary for it to reach a just conclusion. Simply stated, it was well within the province of the jury to conclude, despite Morin's protestations to the contrary, that, from a distance of 500 feet, he could indeed have readily determined whether the suspect's hair was platinum blond (white) or dark brown (black). Equally poisonous, Morin was permitted to view the scene at the precise moment that appellant was led from his home in police custody.

Although the extent and degree of cross-examination is

ordinarily within the trial court's discretion, and not to be disturbed lightly, in a case as tightly drawn as here, it seems to me that simple justice demands that wide latitude be afforded the defense on an issue which so vitally affects an honest identification of the suspect.

It has long been settled that absent exigent circumstances, exhibiting a suspect to a witness for identification purposes without the benefit of a lineup is violative of due process *(see, People v Smallwood,* 99 AD2d 819, 820; *People v Brnja,* 70 AD2d 17, 23, *affd* 50 NY2d 366). What is particularly egregious here is the fact that not only were there no exigent circumstances of any kind, but this totally improper viewing by Morin occurred as both the viewer (Morin) and the suspect (Bauer) were on their way to the *same* lineup. An incredible situation. This was an outrageous violation of appellant's due process rights, and, in my opinion, warrants a reversal of the conviction.

### THE ALIBI CHARGE

Let us, arguendo, discount completely the testimony of Beverly Bauer—wife, and obviously interested; Linda Caracci, next door neighbor and close friend; and Margaret Soriano, close friend. But what do we do with the testimony of Maureen Forde?

We must reflect upon the sharp and clear conflict between the testimony of two totally disinterested witnesses.

Maureen Forde never knew or met appellant until January 30, 1979, long after the crime and, according to the record, was a totally disinterested witness. It is interesting that at the first trial, the prosecutor characterized Mrs. Forde as "a believable person". Her uncontradicted testimony is that she saw appellant at 9:35 A.M. on the day of the crime putting out the garbage in front of his home at 84 New Mill Road.

Mildred Meyer cooperated fully with the police and traveled with them to headquarters in Yaphank to view pictures and Miraquick in an endeavor to identify the perpetrator. She viewed the January 22 lineup but could identify no one. She commented that no one in the lineup resembled the perpetrator. Mrs. Meyer in her sworn statement of January 22 said that she saw a Mercury Cougar in the parking lot at NBNA at 9:25 that morning. The witness said that some 10 minutes or so later—making it then about 9:35 to 9:45 A.M. she saw that same Cougar, wheels spinning, gravel flying as it rushed

madly from the parking lot. This is the precise time that Mrs. Forde saw the appellant out on New Mill Road some 3½ miles away. In the fleeting moment that Mrs. Meyer viewed the driver, she said he was a teen-ager and then revised that figure up to 21 years of age and that he had platinum blond hair.

In response to this totally dead-end conflict, it was the People's answer that if Mrs. Forde saw appellant at 9:25 A.M., he still had sufficient time to drive out to the bank and commit the crime at 9:40 A.M. Such an explanation falls far short of the mark. The record clearly establishes that Mrs. Forde not only saw him at about 9:25 A.M., at his home, but she heard Caracci talking to Mickey (Bauer) on the telephone at 9:40 A.M. This makes it utterly impossible for Mrs. Meyer to see his Mercury Cougar parked at the bank at 9:25 A.M. or to see its wheels spinning, and gravel flying as it rushed from the parking lot at about 9:35 to 9:45 A.M.

Alibi is always a question of fact for the jury but in the overall of this extremely weak identification case, I submit that the failure and refusal of the court to give a proper alibi charge as requested by the defense mandates a reversal.

This is how it all came about: both sides had rested, the jury had been excused, and the court called for requests to charge. Defense counsel requested a copy of the Judge's proposed charge and suggested that his requests to charge be made in the morning.

The court replied that as far as the alibi defense was concerned, the burden is on the People to prove the defendant's guilt beyond a reasonable doubt.

"[DEFENSE COUNSEL]: It was my understanding that it was beyond that, that it was the People's burden to actually disprove [interrupted by court]

"THE COURT: You have it misstated. You have it the wrong way around. *The People don't* have to disprove that he wasn't at home. They have to prove that he was, in fact, beyond a reasonable doubt at the bank and is the person".

Obviously, defense counsel was requesting a *Victor* charge, and, just as clearly, the court was in error in denying that request *(see, People v Victor,* 62 NY2d 374).

In addition to this reversible error, the court in its charge indicated or inferred by its very language that there was at least some burden on appellant to prove the truth of the alibi. Such a charge has been repeatedly condemned by the courts.

Here, the court charged: "If the alibi evidence presented by the defendant in this case raises a reasonable doubt in your minds as to the defendant Charles Bauer being the person who committed the crime charged, then the People would have failed to meet their burden of proof and the defendant, under such circumstances, must be found by you to be not guilty".

In *People v Landor* (92 AD2d 625), the court had before it a charge that in substance said the same thing. In reversing the conviction, the court said (p 626): "The court in substance said to the jury that if the alibi is believed and raises a reasonable doubt as to defendant's guilt then defendant 'is entitled to an acquittal'. This instruction implies an obligation that defendant bears some burden of proof on the alibi. Its implication is contrary to the law (Penal Law, § 25.00; see *People v Russell,* 266 NY 147; *People v O'Neill,* 79 AD2d 429)".

The Court of Appeals in *People v Victor* (62 NY2d 374, 378, *supra),* flatly stated: "Thus, the People have the burden of disproving an alibi beyond a reasonable doubt, and a Judge must unequivocally state that burden in the jury charge (see * * * *People v Grant,* 84 AD2d 793, 793-794; *People v O'Neill,* 79 AD2d 429, 433, *supra; People v Jones,* 74 AD2d 515; 1 NY CJI 12.10)".

The court concluded that the charge in that case was not satisfactory without the additional requested warning that the People had the entire burden of disproving the alibi beyond a reasonable doubt.

We must then address the issue whether these obvious errors in the charge have been preserved for appellate review *(see, People v Hoke,* 62 NY2d 1022). Under *Hoke* guidelines, it is proper to conclude that the request for a *Victor* charge has been preserved.

That the appellant may not have specifically excepted to the charge as given is quite understandable considering the circumstances existing throughout the entire discussion concerning the charge.

First of all, the court called for oral requests and then, in effect, denied a defense application that he be given a copy of the proposed charge so that he could make requests the following morning.

Then the defense specifically requested a *Victor* charge, which the court denied, as it flatly ruled that the only burden upon the People was to prove appellant's guilt beyond a

reasonable doubt. And there the matter came to rest. What to do about it all?

Could she but speak, what would Justice suggest as she reviewed some of the silent facts of the record?

(1) She would quickly tell us that this is not a case involving metes and bounds or dollars and cents nor is it a case where a defendant's guilt has been overwhelmingly established. She would note that an eyewitness identification case is a very special breed, not to suggest that there be different standards for different cases, but she would direct our attention anew to the lament of *Wade (United States v Wade,* 388 US 218, 229): " '[Mistaken identification] probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined' ".

(2) She would say that, upon these facts, the court's failure to give, as requested, a *Victor* charge is particularly egregious in this particular case. There is not an iota of evidence to indicate any sustained effort by the prosecution or the police to disprove appellant's alibi. She would point out that the alibi, by any standard, reads well, sounds well and is clearly credible. That the testimony of Mrs. Forde and Mrs. Meyer, both disinterested witnesses is, to any objective observer, particularly impressive. She would note that a *Victor* charge, as mandated by the Court of Appeals, was critical so that the jury might determine whether or not the People sustained their burden of disproving the alibi and to remove any possible inference that the appellant bore some burden to prove the alibi.

(3) Justice would surely lament that for the police to deliberately place Morin—who except for 1 or 2 seconds (and then only under extreme emotional conditions), had never before seen appellant—in a position to view appellant at the precise moment that he (appellant) was led from his home in police custody, constituted a gross violation of his constitutional rights and should be roundly repudiated.

(4) Finally, Justice, I think, would tell us flat out that the testimony of the identifying witnesses—such as it was—possesses, as a matter of law, neither the quality nor the quantity to sustain a verdict of guilty.

Upon these facts, it is extremely doubtful that Justice would tell us to affirm the conviction because somewhere along the road, a terribly frustrated lawyer failed to utter the magic words, "I except".

Rather, it seems to me that Justice, with customary good sense, would urge that we, in her interest and in our discretion, reverse the judgment of conviction and, in light of the evidence, dismiss the indictment. Fiat justitia.

NIEHOFF and LAWRENCE, JJ., concur with MOLLEN, P. J.; O'CONNOR, J., dissents and votes to reverse the judgment appealed from and dismiss the indictment, with an opinion.

Judgment of the Supreme Court, Suffolk County, rendered April 18, 1983, affirmed, and matter remitted to the Supreme Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (5).