■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TIMOTHY BLEAKLEY and JEFFREY J. ANESI, Appellants.—Appeals by defendants from two judgments (one as to each of them), of the County Court, Westchester County (West, J.), both rendered November 7, 1985, convicting them of rape in the first degree (two counts), sodomy in the first degree and sexual abuse in the first degree, upon jury verdicts, and imposing sentence.

Ordered that the judgments are affirmed, and the matter is remitted to the County Court, Westchester County, for further proceedings pursuant to CPL 460.50 (5) with respect to the defendant Anesi.

The underlying judgments of conviction arise out of a sexual assault which occurred during the early morning hours of March 29, 1985, in Westchester County. The complainant testified that during the late evening hours of the previous day, March 28, 1985, she was with her girlfriend at a local bar known as the "824". After consuming a drink the complainant and her girlfriend left the 824 and went to another local bar. The two women had a few drinks at the bar and then returned to the 824 at approximately 3:00 A.M. Upon her return to the 824, the complainant met a male friend named Russell who asked if she was interested in "do[ing] some coke". The complainant said that she was and about an hour later Russell told her, "Come on, we got some coke * * * Let's take a ride". The complainant accompanied him to the parking lot where she was introduced to the defendants, both of whom had also come out of the bar. Russell told the complainant that the defendants were "the ones that have the coke". The complainant did not know either of the defendants prior to that time. The group then got into the defendant Bleakley's car and drove to an area in the vicinity of the Hudson River.

After the group parked on Sixth Street near the river,

Bleakley took cocaine out of his pocket. At that time, Russell gave Bleakley $20. The four occupants of the car snorted the cocaine. Thereafter, they drove back to the 824.

Both the complainant and Russell testified at the trial that when they returned to the 824, Russell began to exit the car first. When the complainant started to get out of the car Bleakley grabbed her hair and pulled her back into the car. Bleakley then sped out of the parking lot causing Russell, who was still partially in the car, to fall to the ground. As they drove away, Anesi climbed into the front seat of the car, thereby positioning the complainant between himself and Bleakley.

When the car stopped in a wooded area, Bleakley threatened the complainant as the two men tore her clothes off. The complainant tried to get out of the car but Bleakley grabbed her and forced her to perform sodomy upon him. Meanwhile Bleakley continued to pull on the complainant's hair. Thereafter Anesi climbed into the back seat of the car as Bleakley pushed the complainant down on the front seat and raped her. During the rape the complainant's head struck the passenger door several times.

A few minutes later, Bleakley got out of the car as Anesi climbed into the front seat and raped the complainant. Thereafter Bleakley, who was outside the car, pulled the complainant out of the car onto the ground. The two defendants then raped her again. Then the men threw the complainant's clothes at her and told her to get dressed. The complainant begged the defendants to take her back to her car which was parked at the 824. At trial, the complainant testified that she got in the car and, while en route to the bar, Bleakley dropped Anesi off at his house. When they arrived at the parking lot, Bleakley told the complainant, "If you go to the cops you're dead", and then kicked her out of the car.

After the defendants left, the complainant got into her car and drove to her boyfriend's house but he was not at home. She then called her boyfriend at work and asked for help. Her boyfriend met the complainant outside the 824 bar and she proceeded to tell him about the attack. He observed that the complainant was hysterical and was crying. According to the boyfriend, he told the complainant that she should go to the police; however, he did not offer her any assistance and returned to work. In contrast, the complainant testified that he told her to go home, take a shower and go to work.

After her boyfriend left, the complainant went home, took a

shower and went to work. At work, the complainant felt sick and was unable to concentrate. Upon returning home, she took Valium and slept until the following morning. When she awoke, the complainant called her girlfriend and told her that she was bleeding from the vagina. Her girlfriend and her boyfriend picked the complainant up and brought her to the hospital. While at the hospital, the police interviewed the complainant and she told them about the rapes and sodomy. She explained that she had not gone to the police earlier because she was scared.

At trial, the medical testimony of the nurse and the physician who had treated the complainant at the hospital indicated that the complainant had not suffered from any bruises, lacerations or cuts. The physician stated that the pelvic examination of the complainant produced normal results although the examination did reveal the presence of sperm in her vagina. A forensic examination of the clothes worn by the complainant on the day of the attack also established the existence of sperm on her blouse, slacks and pantyhose. Samples of hair recovered from the front seat of Bleakley's car were tested and were found to be similar to the complainant's head hair.

Bleakley was eventually arrested on April 1, 1985, at which time his car was seized. After being advised of his *Miranda* rights, Bleakley told the arresting officer that he had spent the evening in question with two friends and was home at approximately 3:00 A.M. Bleakley also stated that he had not been at the 824 bar for a couple of weeks.

While Bleakley was being transported to the county jail later that day, the officer stopped at a nearby delicatessen to purchase a sandwich for Bleakley. When the officer pulled into the parking lot, Bleakley's father and his attorney were standing outside the store talking to Anesi. Anesi ran away when the officer exited his car. He eventually surrendered to police several days later. After being advised of his *Miranda* rights, Anesi asked the arresting officer how he could be arrested "based on one person's say-so". When he was told that corroboration existed, Anesi inquired: "How could anybody corroborate it when there was no one else there". At trial, Anesi conceded the voluntariness of these statements.

Sometime after the felony hearing was held on the charges against the defendants, the complainant was in the 824 bar when she was approached by Anesi who asked to speak with her. The two then sat down at a table, and the complainant asked: "Why didn't you get help. Why didn't you help me". In

response, Anesi offered to testify against Bleakley and say that Bleakley raped the complainant provided that she did not implicate him. Anesi explained that his relationship with his girlfriend and his family life was ruined. The complainant refused to accept Anesi's offer.

Both the defendants testified at trial. Anesi stated that while he and Bleakley were at the 824 bar during the early morning hours of March 29, 1985, they were approached by Russell who knew a girl who "wants to go out and she'll do anything you want with her". Anesi and Bleakley then went out in the parking lot with Russell and met the complainant. The four then drove to a secluded area and snorted cocaine. When they returned to the parking lot of the bar, both defendants testified that Russell got out of the car and said good night. The complainant then invited Anesi to the front seat of the car as Bleakley drove to a wooded area.

Once they parked the car, the complainant allegedly told the defendants that she would only have sex with one of them. Anesi then got into the back seat of the car while the complainant and Bleakley engaged in intercourse. After the complainant and Bleakley got dressed, Anesi got back into the front seat and they drove back to the bar. While en route, the complainant allegedly asked Bleakley for $1,000. According to Bleakley, he told the complainant that he would meet her at the 824 the following evening and give her money.

Anesi acknowledged that when he observed the complainant at the 824 several weeks after the incident he approached her and asked to speak with her. Anesi told the complainant that she was causing a lot of trouble by claiming that she had been raped. According to Anesi, the complainant responded: "I don't know why I'm doing this".

The jury found both the defendants guilty of two counts of rape in the first degree based upon the attacks which occurred on the front seat of the car, as well as sodomy in the first degree and sexual abuse in the first degree. The defendants were acquitted of the two remaining counts of rape in the first degree concerning the attacks which allegedly occurred outside the car.

On appeal, the defendants maintain that their guilt of the charged crimes was not proven beyond a reasonable doubt. Primarily the defendants focus on certain discrepancies in the complainant's testimony regarding the alleged attacks, the absence of medical evidence indicating the use of force or coercion on the complainant, as well as the complainant's

failure to contact the police immediately after the attacks. Although certain inconsistencies concededly exist in the evidence adduced at trial, we conclude that the evidence as a whole is sufficient to support the judgments of conviction.

It is axiomatic that in reviewing the legal sufficiency of the evidence in a criminal case, an appellate court is required to view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found that the defendant's guilt was proven beyond a reasonable doubt (see, Jackson v Virginia, 443 US 307, 319; People v Lewis, 64 NY2d 1111, 1112; People v Malizia, 62 NY2d 755, cert denied 469 US 932). Furthermore, as this court stated in People v Bauer (113 AD2d 543, 549, lv denied 67 NY2d 648), "the function of an appellate court is not to substitute its judgment for that of the jurors on matters of credibility or the weight to be accorded to the evidence presented at trial". In the case at bar, the evidence adduced at trial when viewed most favorably to the prosecution, established that the complainant was sexually assaulted and raped by the defendants. Besides the complainant's testimony concerning the attack, Russell confirmed the fact that as he was getting out of the car at the 824 parking lot, Bleakley sped out of the lot, causing him to fall to the ground while the complainant remained in the car with the defendants. The medical and forensic evidence also established that sexual intercourse had occurred. The complainant's boyfriend testified that when he met the complainant outside the 824 shortly after the attack, she was in a hysterical condition and was crying and shaking. Admittedly, the complainant did not report the incident to the police immediately after the attack; however, it was established that Bleakley had threatened her life if she spoke to the police, thereby causing her to fear retribution if she contacted the authorities. The complainant did relate the circumstances of the attack to the hospital personnel and when the police responded to the hospital, she told them about the rapes and sodomy.

The inconsistencies in the evidence which are highlighted by the defendants, as well as by our dissenting colleague, were brought out at trial and were presented to the jury for its consideration in judging the credibility of the respective witnesses. We find no basis in the record to disturb the jury's verdicts since issues of credibility are reserved for the jury and its determination should not be lightly overturned on appeal (see, People v Bauer, supra, p 549; People v Di Girolamo, 108 AD2d 755; People v Rodriguez, 72 AD2d 571).

Moreover, by voting to reverse the judgments of conviction based on apparent inconsistencies in the complainant's testimony, our dissenting colleague chooses to ignore the well-established legal standards with respect to the scope of appellate review in criminal cases (see, People v Bauer, supra, p 549).

The defendants also place great emphasis on the fact that the jury, while convicting them for the rapes inside the car, acquitted them of the rapes alleged to have occurred outside the car. The defendants submit that the factual inconsistencies in the verdicts demonstrate that the jury either found that no sexual intercourse took place or that the element of forcible compulsion was absent. In either case, the defendants contend that the jury obviously did not find the complainant completely credible, thereby warranting reversal of the judgments of conviction. We disagree.

In the first instance, as noted by the dissent, the acquittal of the defendants on the two rape charges concerning the alleged attacks outside the car does not render the verdicts inconsistent as a matter of law (see, People v Tucker, 55 NY2d 1, 7). The jury might have believed that the defendants' guilt had been proven beyond a reasonable doubt as to the rapes and sodomy in the car but harboured some doubt as to what occurred outside the car. Moreover, the defendants urge this court to intrude into the jury's deliberative process by speculating as to how the jury weighed the evidence. Such speculation is an improper function of an appellate court. As the Court of Appeals noted in People v Tucker (supra, p 7): "[t]he problems of second-guessing [the jury] are compounded by the possibility that the jury has not necessarily acted irrationally, but instead has exercised mercy (Dunn v United States, 284 US 390, 393-394; People v Berkowitz, 50 NY2d 333, 346). When the jury has decided to show lenity to the defendant, an accepted power of the jury (see, Dunn v United States, 284 US 390, supra; Bickel, Judge and Jury—Inconsistent Verdicts in the Federal Courts, 63 Harv L Rev 649, 651-652), the court should not then undermine the jury's role * * * by setting aside the verdict". In this case, it is obvious that the jury sought to exercise mercy towards the defendants by acquitting them of the remaining two rape counts. Thus, its determination should not be disturbed.

We have reviewed the defendants' remaining contentions and find them to be either unpreserved or without merit. Mollen, P. J., Thompson and Rubin, JJ., concur.

Brown, J., dissents and votes to reverse the judgments of

conviction and dismiss the indictment, with the following memorandum: In my judgment, the quantity and the quality of the evidence in this case is not sufficient to support the verdict of the defendants' guilt beyond a reasonable doubt (CPL 470.15 [5]).

I base my conclusion upon a number of considerations. The record is replete with discrepancies between the complainant's initial account of the incident as first reported to hospital personnel some 36 hours after the alleged incident, and the version to which she testified at trial. There also are numerous inconsistencies between the complainant's trial testimony and the testimony of other witnesses, including that of some witnesses called by the prosecution. Moreover, there is a total lack of corroborative medical evidence to support the complainant's allegations of physical abuse which she claimed to have suffered during the incident. It also appears that not only did the complainant fail to promptly report the alleged incident to the police, but it was the hospital personnel and not the complainant who first reported complainant's story to the police. Additionally troublesome factors are the complainant's own testimony that approximately two weeks after the incident she had a conversation with one of her alleged assailants, the defendant Anesi, in which she asked him why he did not help her, and the fact that the jury apparently entirely discredited the complainant's testimony regarding the alleged assaults outside of the car which she concededly had entered voluntarily with the defendants, while finding the defendants guilty of acts which she claimed occurred inside the vehicle moments earlier. While the acquittal of the defendants on these charges did not render the verdict inconsistent as a matter of law (see, People v Tucker, 55 NY2d 1), it nonetheless gives added significance to the serious flaws in the prosecution's case.

As I stated in my dissent in People v Bigelow (106 AD2d 448, 451): "The general rule, of course, is that as appellate Judges we should hesitate to overturn a jury verdict based strictly upon our own evaluation of the witnesses' credibility (People v Atlas, 183 App Div 595, affd 230 NY 629). Nonetheless, we are obliged to review the entire record in a criminal case to determine whether the evidence is sufficient in quality and quantity to justify the jury's finding of guilt beyond a reasonable doubt (People v Reed, 40 NY2d 204; People v Santos, 38 NY2d 173). And it is, of course, fundamental that if, upon such review, we find the record to be deficient, we are obliged to set aside the finding of guilt (People v Santos,

*supra).* Unlike the Court of Appeals, however, which may only review the evidence in a case to determine whether it is legally sufficient as a matter of law (CPL 470.35; *People v Contes*, 60 NY2d 620), this court is empowered not only to reverse a judgment of conviction based upon a determination that there is a lack of legally sufficient evidence (CPL 470.15, subd 4, par [b]), but it may also weigh the evidence and, if appropriate, reverse a judgment based upon a factual determination that the verdict is against the weight of the evidence (CPL 470.15, subd 5; *see, People v Carter*, 63 NY2d 678)".

This, in my opinion, is such a case. The complainant's trial testimony does not ring true and the cumulative effect of the inconsistencies, discrepancies and deficiencies in the prosecution's case leads me to conclude that the evidence in this record is factually insufficient to support the jury's verdicts. Accordingly, I vote to reverse the judgments of conviction and to dismiss the indictment.